# Allison's Estate.

*Wills—Probate—Issue devisavit vel non—Testamentary capacity—Undue influence—Refusal of issue.*

A jury should not be permitted to guess that there was testamentary incapacity at the time a will was executed, or that the will was the result of undue influence because they might think that a former will made a better disposition of the testator's property than the will contested, and that influence had been brought to bear on him to make the change. Testamentary incapacity or undue influence must be proven before a will can be legally set aside.

An issue devisavit vel non will not be granted on the question of the lack of testamentary capacity or undue influence, where it appears that although the will was written by the deceased's brother, whose wife witnessed it, and whose children were the principal beneficiaries, and although the deceased was at the time blind and ill, there was no reliable evidence that the deceased did not know the natural objects of his bounty, the property he owned, and what disposition he wanted to make of it, or that the brother exercised undue influence over him when he made the will, so that the court could say that the deceased was coerced into making it.

Argued Oct. 20, 1904. Appeal, No. 14, Oct. T., 1904, by H. H. Bebout et al., from decree of O. C. Washington Co., Feb. T., 1903, No. 3. refusing an issue devisavit vel non in Estate of Thomas Allison, deceased. Before MITCHELL, C. J., DEAN, FELL, BROWN, MESTREZAT, POTTER and THOMPSON, JJ. Affirmed.

Petition for an issue devisavit vel non.

McILVAINE, P. J., filed the following opinion :

Thomas Allison died in the very early morning of Tuesday, August 19, 1902. On Saturday, August 16, 1902, about four o'clock in the afternoon, he made his last will and testament. Jonathan Allison was the scrivener of that will, and he and his wife Margaret Allison witnessed its execution. On August 22, 1902, the will was probated without objection from any source. Albert J. Allison and Thomas G. Allison, the executors, settled their account and immediately made distribution. On February 10, 1903, the Board of Trustees of the Chartiers Presbyterian Church, which was a beneficiary under a former will made by Thomas Allison, presented its petition in this

court stating that his will of date August 16, 1902, was made when he did not have testamentary capacity, that it was made by reason of Jonathan Allison having exercised undue influence over him to have him make it, and that he did not sign the paper at the end thereof, and praying that an issue be certified by this court into the court of common pleas to be tried by a jury to determine whether these allegations were true or not. After notice to the executors and legatees named in the will, testimony taken before a commissioner was submitted to the court and argued by counsel; and the question now for decision is: Should the prayer of the petition be granted and an issue awarded to be tried by a jury in the court of common pleas? The first inquiry is: What rule shall guide us in determining this question? It is this: Suppose the issue asked for had been granted, with the executors as plaintiffs, and suppose the case were before a jury on trial, testimony closed (being the testimony now before us) and suppose the executors, the plaintiffs, had just presented this point to the court: Under the evidence in this case the verdict of the jury must be in favor of the plaintiffs, would the court feel constrained to affirm the point and thus give binding instructions to find for the plaintiffs and in favor of the will? Or, to state the rule another way: Suppose the jury had found against the will and in favor of the defendants without such a point having been presented, and the executors, the plaintiffs, had made a motion for a new trial, assigning as a reason in support of the motion that the verdict was not supported by the evidence, would the court feel constrained to set the verdict aside and grant a new trial? This brings us to a consideration of the evidence.

Thomas Allison, the testator, was between seventy-seven and seventy-eight years old when he died. He died of Bright's disease, with which he had been afflicted for some time. In the fore part of July, five or six weeks before his death, his illness was of an acute nature and he took his bed. From that time until his death he needed constant attention. He was blind and had been so for two years or more. The acute attack that put him to bed in the first part of July was of such a character as to make him drowsy and when not in pain he slept a great deal. The cause of this was probably the uremic poison

in the blood produced by the condition of his kidneys. He was weak and at times did not have control of his bowels. When the medicine administered had its effect on his kidneys and the poisonous matters were thrown off and thus prevented from being taken up in the blood, he would be brighter. He sometimes would imagine that he was not at home and would tell the nurse he must go and would try to get out of bed. He sometimes would involuntarily befoul the bed and more than once put his hand in the excrement. He became unconscious on the evening of Monday, August 18, 1902, and from that until one o'clock A. M. Tuesday, the 19th, the hour of his death, was in a dying condition.

Thomas Allison was unmarried and his heirs at law were Jonathan Allison, a brother, Joseph Allison, a brother, David Allison, a brother, and Mary Allison, a sister. Jonathan Allison is married, has six children living and lives in East Washington, in this county. Joseph Allison, David Allison and Mary Allison are all single and never have been married. They live on a farm in Chartiers township, in this county. Up until about four years ago Thomas Allison, the deceased, lived with them, when his eyesight became bad and he came to the home of his brother Jonathan where he resided and was cared for until the time of his death. About two years ago, as we have already indicated, he became totally blind. While he resided in Chartiers township he attended the Chartiers Presbyterian Church but was not a member. After he came to East Washington he did not attend this church and his intercourse with its members, by reason of the distance, ceased.

In 1889 he made a will in which he bequeathed to the Chartiers Presbyterian Church one hundred shares of the stock of the Exchange Bank of Pittsburg, Pa. In 1894 he made another will, revoking the will of 1889, but in which he made the same bequest to the Chartiers Presbyterian Church. The last will was written by R. V. Johnson, and he and Albert G. Allison were named as executors. The will was left in the custody of Mr. Johnson and he had it at the time of Thomas Allison's death.

According to the testimony of the witnesses to the will of date August 16, 1902, it was made under the following circumstances : Just after lunch at the noon hour of that day Thomas

Allison and Mrs. Margaret Allison were in his, Thomas Allison's, room when he asked if Jonathan had gone to town. (Jonathan's office was in Washington a half a mile or more distant from his residence.) She told him he had. She then asked him if he wanted his brother. He replied that he did; that he would like to have him here—that he wanted to change his affairs. He had once or twice before this spoken in Mrs. Allison's presence of wanting to change his will and she supposed this was what he meant. Jonathan returned to his home between three and four o'clock of that afternoon and on his return Mrs. Allison told him that "Tommy" wanted to see him and had requested him to come to his room as soon as he came home. He went from the library to "Tommy's" room, taking some writing paper with him. When he reached the room "Tommy" told him that he wanted to make another will. Jonathan called to his wife and asked her to get him pen and ink. She brought him the pen and ink and a book to write on. He then said to "Tommy," "Now, how do you want this, how do you want this property of yours left, 'Tommy'?" "Tommy" replied, "I want Mary and Joseph each to get a thousand dollars." Jonathan then said, "Won't you leave David a thousand?" He replied, "No, I won't leave David anything." Then Jonathan said, "What disposition do you want to make of the balance?" He replied, "I want it divided among your children equally, share and share alike." After he finished writing, Jonathan said, "Now, 'Tommy,' I will read you this just as I have written it." He read it over to him. He said after a moment's pause, "Read that again, Jonathan." It was read a second time, when Jonathan said, "Is that the way you want it?" He replied, "That's just the way I want it." Jonathan said, "Well, are you ready to sign it? There is nobody here but mother and I to witness it, but I presume that will do; if you want to sign it, you can make your mark." He sat up in the bed and touched the pen while Jonathan held the pen and made the mark. Jonathan and Margaret at his request signed as witnesses, and "Tommy" then said, "I am satisfied; now I have got things fixed the way I want them." When this will was written he had in mind his former will, as he suggested to Jonathan that he ought to have the will that was in the posses-

sion of R. V. Johnson. Jonathan told him it was not necessary, as he could put in this will that all other former wills were revoked. When Jonathan and Mrs. Allison went upstairs on this occasion, James Walters, a colored boy of seventeen or eighteen years, was in Thomas Allison's room. Before the will was written Mrs. Allison asked him to retire. After he left the room he thought he heard some one say " and the rest to our children."

Jonathan Allison and his brother, after the latter came to the former's home, on more than one occasion had talked of the wills that had been previously made, and Jonathan had expressed the decided opinion that the large bequest to the church was unnatural and wanted him to make another will. At the times these conversations were had Thomas Allison mentally was in his normal condition and was a man of strong will and did his own thinking. In easy reach of Jonathan Allison's are many residences, and it would have taken but a few minutes to have obtained two wholly disinterested persons to have witnessed the will. Jonathan Allison and Margaret Allison, who witnessed the will, in their testimony gave the details of the execution of the will as we have stated them, and gave it as their opinion that " Tommy " was perfectly rational and had an intelligent idea of the business he was transacting. Four of the children of Jonathan Allison and a student at W. & J. College, named Sherrard, who is a relative of the family, and all of whom were in " Tommy's " room on Saturday, August 16, testified that he was rational when they visited him and competent to make a will. The attending physician says that he was rational on Monday morning, August 18; that on his daily visits to him he found him rational when he talked to him. John Walters, a colored man who was employed to nurse the deceased and who was with him continuously for five or six weeks immediately before his death, testified in a rather noncommittal way, " That he didn't know, but he supposed he was not competent to make a will." No other witness expressed an opinion that the deceased did not have testamentary capacity up until Monday morning, August 18.

The foregoing we believe to be a fair statement of the facts relative to the execution of the will and the mental condition of the deceased as they appear in the testimony. Some wit-

nesses, however, were called to discredit Jonathan Allison. R. V. Johnson, the person named in the former will as one of the executors, testified that two or three weeks before the death of Thomas Allison, Jonathan told him that "Tommy's" mind was giving away; that at one other time Jonathan said "Tommy" had not been in his right mind and fit to make a will for thirty years. At another time shortly before "Tommy's" death, Jonathan said "His mind is much better." At another time he spoke of the deceased dirtying the linen and that he put his hand in the discharge from his bowels. That Jonathan told him the next morning after "Tommy's" death that he had made another will, and on being asked when, said two weeks ago. That he also said at that time that it was unfortunate that he and Mag (meaning his wife) were the only witnesses.

Mr. Allison's version of his conversation with R. V. Johnson was that he told him that "Tommy" was bad with his disease; that he suffered, and sometimes would not "be at himself" properly. He denied that he told him that "Tommy" had been out of his mind and not fit to make a will for thirty years. He says that knowing that "Tommy" made his first will when he was mad or in a pet, he did say to Johnson that he was not fit to make a will, that no man had any business making a will when he was mad. He says he told Johnson that "Tommy" made a will two or three days ago, not weeks.

With the case before us as we have found the testimony in brief to be, would the court be constrained on a trial before a jury on such testimony to give binding instructions to find in favor of the proponents of the will or grant a new trial if a jury had found against the will?

We may concede as argued by counsel that the actions of Jonathan Allison in the premises were not what those of many another man would have been under like circumstances, that he threw himself open to criticism and suspicion when he wrote his brother's will, wherein nearly his whole estate is given to his own children, and witnessed it, together with his wife. We also may concede that he thought his brother ought not to give $10,000 to the Chartiers Presbyterian Church and wanted him to change his will in this regard, and so expressed himself to him. And we may concede this showed on his part a grasp-

ing disposition. But these are not the questions to be decided in this proceeding. The question here is: Is there any reliable evidence before us that Thomas Allison was so far without mind as not to know the natural objects of his bounty, the property he owned and what disposition he wanted to make of it when he made his will on August 16, 1902, or that Jonathan Allison exercised undue influence over him when he made it, so that we could say that he was coerced into making it, and that its making was not his act ? We are clearly of the opinion that the testimony submitted to the court would not support a finding in favor of the contestants on either of these questions; and if a jury so found, the court would be constrained to set the verdict aside and grant a new trial. The issue prayed for should therefore be refused. A jury should not be permitted to guess that there was testamentary incapacity at the time the will was executed, or that the will was the result of undue influence because they might think that a former will made a better disposition of the testator's property than the will contested, and that influence had been brought to bear on him to make the change. Testamentary incapacity or undue influence must be proven before a will can be legally set aside. As our Supreme Court has held: " The law presumes that every one of full age competent to make a will, is of sufficient mental capacity to do the act; and allegations to the contrary must be proved. Testamentary capacity is the normal condition of one of full age, and the affirmative is with him who undertakes to call it in question, and this affirmative he must establish, not in a doubtful but in a positive manner: " Grubbs v. McDonald, 91 Pa. 236.

Undoubtedly undue influence may so operate as to destroy a will, for in such a case the testator is not a free agent; he becomes the mere implement of another's craft, and his testament that of a superior will. But influence short of this is not what is technically known as undue influence. The term has been carefully defined, and its effect considered in many of our own cases. According to these cases, undue influence may be exercised either through threats or frauds ; but however used it must, in order to avoid a will, destroy the free agency of the testator at the time and in the very act of making the testament. Solicitations, however importunate, cannot of them-

selves constitute undue influence, for though they may have a constraining effect, they do not destroy the testator's power to freely dispose of his estate: Englert v. Englert, 198 Pa. 326.

And now, September 26, 1903, this citation came on to be heard and was argued by counsel, whereupon, upon due consideration, the issue prayed for is refused and the petition dismissed at the cost of the petitioners.

*Error assigned* was the decree of the court.

*John H. Murdoch*, with him *Edgar B. Murdoch, W. S. Parker, Winfield McIlvaine* and *Norman E. Clark*, for appellants, cited: Palmer's Estate, 24 W. N. C. 159; Cozzens's Will, 61 Pa. 196; DeHaven's Appeal, 75 Pa. 337; Schwilke's Appeal, 100 Pa. 631; Herster v. Herster, 116 Pa. 612.

*T. F. Birch*, for appellees, cited: Kane's Estate, 206 Pa. 204; Miller v. Oestrich, 157 Pa. 264; Cauffman v. Long, 82 Pa. 72; Tasker's Estate, 205 Pa. 455; Roberts v. Clemens, 202 Pa. 198; McMahon v. Ryan, 20 Pa. 329; Eckert v. Flowry, 43 Pa. 46; Thompson v. Kyner, 65 Pa. 368; Tawney v. Long, 76 Pa. 106; Wainwright's Appeal, 89 Pa. 220; Harrison's Appeal, 100 Pa. 458; Trost v. Dingler, 118 Pa. 259.

PER CURIAM, November 4, 1904:
The decree is affirmed on the opinion of the court below.