**ESTATE OF Amos A. ANGLE, Deceased.**

**Appeal of: Faye Heinbaugh, Paul E. Angle, Joseph Angle, Appellants.**

Superior Court of Pennsylvania.

Submitted Feb. 20, 2001.

Filed May 7, 2001.

Kendra D. McGuire, Lancaster, for appellants.

James Angle, appellee, pro se.

Ronald E. Angle, appellee, pro se.

James M. Stein, Waynesboro, for Cline, appellee.

John W. Frey, Waynesboro, for Spielman, for appellee.

Before JOHNSON and JOYCE, and HESTER, JJ.

HESTER, Judge:

¶ 1 Appellants, Faye Heinbaugh, Paul E. Angle, and Joseph Angle, assail the orphans' court's decision to uphold the validity of a will. After consideration of the facts and law as well as the arguments of Appellants, we affirm the orphans' court's conclusion that the will was not the product of undue influence.

¶ 2 Amos A. Angle, a widower, died testate on October 31, 1997, at the age of eighty-three years. His will was dated April 14, 1997, and was probated on June 22, 1998, by the Franklin County Register of Wills. Appellants filed an appeal from probate to the orphans' court. They alleged both that the decedent lacked testamentary capacity and that the will was procured by the undue influence of Ronald Angle, Martha Spielman, and Elizabeth ("Libby") Cline. Both contestants and proponents of the will are children of the decedent. Proponents benefited more than contestants from the probated will. The orphans' court heard testimony and issued findings of fact and conclusions of law upholding the validity of the will. This appeal followed denial of Appellants' exceptions to that decision.

¶ 3 No one suggests that the evidence fails to support the factual findings of the

orphans' court. Accordingly, we now review those findings. Decedent and his wife had ten children, three of whom predeceased Mr. Angle. Three of the surviving seven children are proponents of the will, three are contestants, and the seventh, James Angle, was named as a proponent but testified in favor of the contestants. Decedent owned two pieces of real estate, one located on Hunter Road in Montgomery Township and the other located at Two Top Road in Mercersburg.

¶ 4 Mr. Angle executed a will on June 25, 1982. In that will, he granted Libby one acre of land on the Hunter Road property as well as a trailer situated on that land. There is also a house located on Hunter Road and eleven surrounding acres. The house and remaining acreage were not specifically devised in the 1982 will but passed through the residuary estate. The residuary estate was divided into tenths, with nine of Mr. Angle's children receiving a share and the remaining one-tenth share going to charity.

¶ 5 The contested will, as noted, was executed on April 14, 1997. In that will, Mr. Angle devised two acres of the Hunter Road property, including the house and trailer, to Libby. In addition, he specifically devised the remaining acreage on Hunter Road to Ronald Angle. Mr. Angle also owned a house on the Two Top Road property. That property, which was not specifically devised in the 1982 will, was granted to Martha Spielman for life in the 1997 will. The beneficiaries of the residuary estate remained unchanged. James and Ronald, who were the executors under the 1982 will, remained executors under this will. The 1997 will was prepared by Mr. Angle's attorney, Thomas. B. Steiger, Jr.; it was witnessed by Mr. Steiger and Mr. Steiger's secretary.

¶ 6 Mr. Angle's estate is worth approximately $300,000. The Two Top Road property was appraised at $75,000 to $80,000, and the Hunter Road property was appraised at $84,000 to $99,000.

¶ 7 Appellants-contestants alleged that Mr. Angle suffered from Alzheimer's disease, which prevented him from having testamentary capacity and also permitted Appellees-proponents to exercise undue influence over him so that they benefited more from the 1997 will than they had under the 1982 will.

¶ 8 Three of decedent's ten children died of cancer after the 1982 will was executed. Of the remaining seven children, six live in the Franklin County area and one lives in Utah. Mr. Angle lived in the house on Two Top Road until two months before his death, when he entered a nursing home. He was a retired carpenter and had built the house on Hunter Road in the late 1950s.

¶ 9 Although retired many years before his death, Mr. Angle remained physically active and continued to perform carpentry and other handyman projects. He attended church and his grandchildren's sporting events and maintained his own properties by cutting grass, shoveling coal, and shoveling snow, even into the last few months of his life. He also rode his bicycle several miles almost daily and continued to drive his car. He attended family gatherings and vacations and continued to hunt both in Franklin County and in the west. The orphans' court indicated that everyone described Mr. Angle as an independent, self-reliant man who was stubborn, occasionally bossy and gruff, and was unswayed by other's opinions.

¶ 10 After Mr. Angle's wife died in 1974, Mr. Angle remained in his home on Two Top Road. His daughter, Martha, to whom he left the life estate in that house, moved in with him in 1979, after she separated from her husband. Martha, who worked

as a nursing assistant, remained in that house until her father's death. Martha and her father had separate lives, and while she occasionally cooked for him, he usually cooked his own meals. Martha cleaned the house, did the laundry, and gave her father his medications. Mr. Angle paid the household bills, mowed the grass, and maintained the house. He did not charge Martha rent.

¶ 11 Mr. Angle also allowed Martha's estranged husband to live on a trailer a short distance from the house. Martha did not like this arrangement, and she often fought with her father over it. Mr. Angle refused to remove the ex-husband from the trailer because Mr. Angle liked him. At the hearing, the ex-husband testified that in 1993, he had asked to buy the land on which his trailer sat, but Mr. Angle refused because he did not want to sell the land where Martha lived.

¶ 12 The Hunter Road property, as noted, had both a trailer and a house located on it. Libby Cline, her husband, and their three children lived in the trailer until 1993. At that time, Libby became pregnant with her fourth child. This event was a surprise since she had undergone a tubal ligation in 1986. At that time, Libby also was undergoing reconstructive surgery following an occurrence of breast cancer. She asked Mr. Angle if she and the children could move into the house on Hunter Road, which was rented at the time, and he agreed. Libby testified that she told her father she wanted to purchase the home, but he declined payment and indicated that he considered the property as belonging to her already. Libby and her husband refurbished the home and invested $15,000 of their own money. Mr. Angle also contributed financially to improving the house at that time. Libby testified that over the years, she frequently offered to purchase the Hunter Road house, but

Mr. Angle continually declined, always saying that he already considered the home as hers.

¶ 13 Ronald Angle, who received the acreage on Hunter Road not given to Libby, was Mr. Angle's youngest son. He lived near his father on Two Top Road, and enjoyed a very close relationship with his father for many years. They hunted and worked on carpentry projects together. Mr. Angle also was close with Ronald's wife and their two sons.

¶ 14 Rex Sanders, who was Libby's neighbor and a friend to Libby and Mr. Angle, testified as follows. In 1993, Mr. Angle told him that he wanted to update his will to leave Ronald the mountain acreage on Hunter Road so that Ronald could pass the land down to his own two sons and keep the land in the Angle name. Mr. Angle also told him that he wanted to give the home on Hunter Road to Libby because he felt that she never would be able to afford a home. Ronald confirmed Mr. Sander's testimony regarding Mr. Angle's intent. Ronald testified that his father also told him that he wanted to give Libby the home on Hunter Road due to her financial circumstances.

¶ 15 After 1993 and up until he entered a nursing home in August 1997, Mr. Angle spent most of his time with Libby's family on Hunter Road. He was extremely attached to Libby's fourth child, Alicia, who had been born with Down's Syndrome. He had a key to the house and either drove, walked, or rode his bicycle there as often as three times a day. Mr. Angle often would give either Libby or her children money from his social security check.

¶ 16 The orphans' court noted that the evidence clearly showed that there were longstanding tensions and jealousies among the children due to the contestants' belief that Libby, Martha, and Libby's children were being favored and were tak-

ing advantage of Mr. Angle's generosity. Libby's adult daughter testified that she ceased attending family gatherings in 1995 or 1996 because she would overhear negative comments about her parents made by the other relatives.

¶ 17 Mr. Angle started to become forgetful in the early 1990s. He sometimes became disoriented in the forest during hunting trips and occasionally missed doctors' appointments unless reminded about them. He continued to drive and often babysat Mr. Sanders's children. He continued to handle his financial affairs without assistance until fall of 1996.

¶ 18 In fall of 1996, Mr. Angle came to his attorney's office *unaccompanied* and told Mr. Steiger that he wanted to change his will to leave additional acreage to Libby. Since Mr. Angle did not have an appointment, the two men were not able to discuss the matter in detail.

¶ 19 By the end of 1996, bank tellers began to notice Mr. Angle was experiencing difficulty with transactions. Around this time, Libby approached her father and asked for a loan. Her husband had suffered an injury and was not able to work but had been denied workers' compensation benefits. She also had debt on her credit card from her reconstructive surgery. Mr. Angle cashed a $50,000 certificate of deposit, gave Libby $30,000, and re-deposited the rest. Libby also noticed that her father was not paying his bills and asked him if he needed assistance. Mr. Angle responded that he did and asked Libby if she would become his attorney-in-fact. Libby consulted with Ronald and then told her father that Ronald could fill that role.

¶ 20 Ronald contacted all the other siblings, and they agreed that Ronald should be the attorney-in-fact. Mr. Angle signed a power of attorney on January 7, 1997, at Mr. Steiger's office. Mr. Steiger testified that Mr. Angle appeared to have no difficulty understanding the purpose of the document he was signing and that there was no indication that Mr. Angle was being coerced or manipulated. Ronald and his wife were present when the document was executed. At that time, Mr. Angle again mentioned that he wanted to change his 1982 will, and Mr. Steiger gave him a copy of it to review.

¶ 21 As attorney-in-fact, Ronald paid his father's bills and arranged for automatic payment of utility bills and direct deposit of Mr. Angle's social security check. Mr. Angle continued to write his own checks for cash for daily expenses. Ronald also arranged for Libby to sign a promissory note to evidence Mr. Angle's loan to her and to memorialize the agreed repayment and interest schedule. Libby had made one payment on the loan before the note was prepared. She continued to make monthly payments on the loan until Mr. Angle's death.

¶ 22 Libby testified that in late 1996 and early 1997, her father knew he still had prostate cancer and knew his mental condition was deteriorating. Concerned about his increasing forgetfulness and fearing his cancer had spread, on January 14, 1997, Libby took him to see his physician, Dr. W. David Kent. Dr. Kent, who cares for many geriatric patients in his practice, noticed a significant change in Mr. Angle's mental status since his previous visit in May of 1996. Dr. Kent testified Mr. Angle exhibited deficits in five cognitive areas: orientation, intellect, judgment, memory and affect. After asking Mr. Angle questions to determine his abilities in those areas and generally observing him, Dr. Kent concluded he was suffering from dementia and ordered a CT scan of his head to determine its cause. After reviewing the scan in late January, Dr. Kent concluded that Mr. Angle's dementia was attribut-

able to Alzheimer's disease. Blood tests revealed Mr. Angle was also in a late stage of prostate cancer. Libby told Dr. Kent she wanted to schedule a family meeting to discuss her father's condition. She also expressed this desire to her siblings but the meeting did not occur until August 22, 1997.

¶ 23 On February 10, 1997, Mr. Angle threw kerosene on burning coals in his furnace and the flare up caused irritation to his throat. He could not recall the incident when examined by Dr. Kent three days later. Dr. Kent learned of the incident from Libby's son, Ethan, who had accompanied his grandfather to the doctor.

¶ 24 On February 14, 1997, Mr. Angle and Ronald met with Mr. Steiger to discuss the changes to his will. The life estate to Martha was discussed in detail at the meeting. Mr. Steiger and Ronald were opposed to it, but Mr. Angle was adamant on the issue. According to Mr. Steiger and Ronald, Mr. Angle did not want simply to give Martha the house because she was still married and the property would pass to her husband if she predeceased him.

¶ 25 Mr. Steiger stated that Mr. Angle knew what he wanted and was very clear about how he wanted to dispose of his assets. He did not appear to be manipulated by anyone, including Ronald, who primarily stayed in the background while Mr. Angle spoke. Mr. Steiger also testified the will changes were normal property dispositions. Mr. Steiger was generally familiar with the personal circumstances of Mr. Angle's children, including that Martha had lived with her father at Two Top Road for many years and did not have a home of her own. Mr. Steiger did not consider the changes unusual nor did he notice Mr. Angle repeating himself or acting in a confused manner.

¶ 26 The orphans' court found specifically that "[t]he undisputed evidence showed Mr. Angle knew the general economic standing of all his adult children, particularly that Libby and Martha were his only children lacking homes of their own." Trial Court Opinion, 3/21/00, at 12. These observations by Mr. Angle were accurate in that Dean and Faye Heinbaugh own a well-established masonry contracting business and a four-bedroom stone cape cod home on four acres worth approximately $200,000. They also own farmland behind the house. Faye admitted their assets exceed the value of her father's total assets at the time of his death and that Mr. Angle was aware of that fact. Mr. Angle also knew his son James, a retired electrician, owned two pieces of investment real estate and a fifty-six acre farm. Paul, the other contestant, works for a masonry contracting company, and he and his wife have owned a four-bedroom home since 1971.

¶ 27 Dr. Kent saw Mr. Angle at his office for a follow-up visit on February 21, 1997. Mr. Angle had experienced minor dizziness that morning, which Dr. Kent attributed to an ear abnormality. Mr. Angle was not disoriented at the time of the visit, and actually had ridden his bike that morning for several miles. Although Dr. Kent did not see Mr. Angle at his office again until July 2, 1997, he did see Mr. Angle occasionally at church during the spring and summer and noticed he often repeated himself during conversations.

¶ 28 Dean Heinbaugh testified Mr. Angle tearfully told him sometime between February and April, 1997, that Libby was withholding access to her children until he changed his will. James Angle testified his father said the same thing to him sometime in the last two years of his life but could not recall the time more specifically. Both men testified they never con-

fronted Libby about the matter because they were reluctant to interfere in Mr. Angle's affairs. By contrast, Libby, Martha, Ronald, Billy Cline and Rex Sanders denied any such withholding occurred or that any change took place in Mr. Angle's usual practice of spending most of his time at Libby's house. Billy testified her grandfather would have come to the house regardless, even if he had to walk, because he was stubborn and always had a key. Martha echoed Billy's testimony on this point.

¶ 29 Faye and Dean Heinbaugh testified to a discussion with Martha in March or April 1997 about Mr. Angle's will during which Martha purportedly stated she should get Two Top Road if Libby gets Hunter Road. James testified that he overheard Martha say this directly to Mr. Angle but he could not recall what year this conversation allegedly occurred. Martha denied these conversations took place.

¶ 30 Mr. Sanders testified that several times in 1996 and 1997, Mr. Angle told him that he wanted to change his will to leave the Hunter Road house and more acreage to Libby. Mr. Sanders also stated that Mr. Angle knew what he owned and what his children owned. Finally, Mr. Sanders said that Mr. Angle was concerned for the welfare of Libby's family because Libby did not have assets. Libby's bout with breast cancer also upset Mr. Angle because he already lost three children and his wife to cancer. When Mr. Sanders asked Mr. Angle how his other children, the contestants, would react to the will changes, Mr. Angle responded that he was completely unconcerned about their potential reactions.

¶ 31 Mr. Angle, accompanied by Ronald, went to Mr. Steiger's office on April 14, 1997, to execute the new will. Mr. Steiger testified that Mr. Angle appeared to understand the changes. Mr. Steiger has practiced law for many years and prepares and witnesses approximately twenty wills each month; he found nothing unusual about the changes or Mr. Angle's conduct at the signing.

¶ 32 Meanwhile, in April and May 1997, Mr. Angle remained active. He used his carpentry skills to help Ronald and Mr. Sanders build a house. He was at the job site almost daily, doing light tasks such as hammering and carrying tools and materials. Ronald would not allow him on the roof because he was less physically nimble than in prior years, and Mr. Angle accepted that limitation. He continued to drive and ride his bike daily to Libby's house and other places. He also fixed himself small meals, purchased groceries and other personal items, and maintained his home as he always had. Mr. Sanders testified that he never saw anyone dominate Mr. Angle either at the job site or anywhere else, and any such efforts would have been futile since Mr. Angle frequently told others what to do.

¶ 33 Mr. Angle expressed a desire to buy a new car for himself in May. Ronald opposed the purchase because it seemed unnecessary, but Mr. Angle continued with the purchase. Ronald did not use his power as attorney-in-fact to interfere with his father's plans.

¶ 34 The orphans' court found that Mr. Angle's mental condition began to deteriorate rapidly in mid-June 1997. He wandered into a neighbor's house over the July 4th weekend to measure their linoleum, believing he had been hired to do an installation job. He frequently became confused as to dates and times and became lost while driving in Chambersburg. In late July, police found him stopped on the roadside in the Philadelphia area in a confused state. Dean Heinbaugh testified that he saw Mr. Angle urinating from the front porch and that he failed to recognize Dean.

He often left his car keys and signed, blank checks in the car with the windows open. He repeatedly told his family that he was having an affair with a young woman, and she was going to have his baby. Mr. Angle repeated himself several times during a July 22nd visit with Dr. Kent, and it was clear he was not taking his medication regularly. Dr. Kent described Mr. Angle's story about the young woman as a fixed delusion often occurring in the mild to moderate stages of Alzheimer's disease.

¶ 35 Mr. Angle's family met to discuss his condition on August 22, 1997. It was at this meeting that his family members first learned there was a new will. Mr. Angle was admitted to a nursing home, over Martha's objections, shortly thereafter. He died there on October 31, 1997.

¶ 36 Dr. Kent's February 27, 1998 affidavit contains the following opinions: Mr. Angle suffered from Alzheimer's disease for several years before his death; he was mentally incompetent in April 1997 because of the disease and could not have had instances of lucidity during that month; and he was not competent to make testamentary decisions in 1997.

¶ 37 At trial, Dr. Kent defined Alzheimer's as a degenerative brain disease. The disease starts slowly, and its symptoms are subtle in the early stages. An individual in this mild stage may have short-term memory lapses such as forgetting to pay bills. Symptoms become more pronounced in the moderate stages and eventually the disease becomes so severe the individual is completely unable to care for his physical needs. The speed of the decline varies from person to person.

¶ 38 The basis for Dr. Kent's opinion that Mr. Angle was not mentally competent in April 1997 was that lucidity disappears after a diagnosis of Alzheimer's disease and that once the disease appears, a person never is normal again. Dr. Kent defined normal in this context as the absence of a deficit in orientation, intellect, judgment, memory and affect. Dr. Kent conceded that he was unfamiliar with the level of mental competence required for testamentary capacity. Dr. Kent also conceded that he could not state with reasonable certainty that Mr. Angle suffered from Alzheimer's for several years. He was certain its onset occurred no later than January 1997. However, Dr. Kent did not suspect the presence of Alzheimer's disease in May 1996, during Mr. Angle's last appointment before the January 7th office visit.

¶ 39 Dr. Kent also testified that Mr. Angle always appeared to know his children. When specifically questioned about Libby, Dr. Kent stated that he never observed her dominating or controlling her father. He also acknowledged that he did not see Mr. Angle at his office between February 21 and July 2, 1997, and therefore could not describe with certainty Mr. Angle's cognitive functioning on any particular day during that period.

¶ 40 Based on these factual findings, the orphans' court determined that Mr. Angle possessed testamentary capacity when he executed the April 14, 1997 will and that none of the proponents had exercised undue influence over him to obtain that document. It therefore upheld the probate of the will. On appeal, Appellants assail the trial court's conclusion that Appellants failed to meet their burden of proof regarding the exercise of undue influence by the proponents.

¶ 41 We first examine our standard of review of an orphans' court order:

When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Be-

cause the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of that discretion.

*In re Estate of Harrison,* 745 A.2d 676, 678 (Pa.Super.2000) (quoting *In re Estate of Geniviva,* 450 Pa.Super. 54, 675 A.2d 306, 310 (1996)).

¶ 42 Once a will has been probated, the contestant who claims that the will was procured by undue influence has the burden of proof. *In re Estate of Stout,* 746 A.2d 645 (Pa.Super.2000). A *prima facie* case of undue influence is established and the burden of proof is shifted to the will's proponent when three elements are established: 1) there was a confidential relationship between the proponent and testator; 2) the proponent receives a substantial benefit under the will; 3) the testator had a weakened intellect. *Id.* For purposes of the undue-influence test, a weakened intellect does not rise to the level of testamentary incapacity. *In re Estate of Glover,* 447 Pa.Super. 509, 669 A.2d 1011 (1996).

¶ 43 A confidential relationship for purposes of undue influence exists "whenever circumstances make it certain that the parties did not deal on equal terms but that on one side there was an over-mastering influence, and on the other, dependence or trust, justifiably reposed." *In re Estate of Jakiella,* 353 Pa.Super. 581, 510 A.2d 815, 817–818 (1986); *see also In re Estate of Clark,* 461 Pa. 52, 334 A.2d 628 (1975). The term "influence" does not encompass every line of conduct capable of convincing a self-directing person to dispose of property in one's favor. *In re Estate of Ziel,* 467 Pa. 531, 359 A.2d 728 (1976). The law requires that the influence be control "acquired over another that virtually destroys [that person's] free agency." *Id.,* 467 Pa. at 540, 359 A.2d at 733. Conduct constituting influence must consist of "imprisonment of the body or mind, fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of a will." *Id.* A parent-child relationship does not establish the existence of a confidential relationship nor does the fact that the proponent has a power of attorney where the decedent wanted the proponent to act as attorney-in-fact. *In re Estate of Jakiella, supra.*

¶ 44 Once the contestants establish a *prima facie* case with the three elements of undue influence, including the existence of a confidential relationship, the burden of proof shifts to the proponents of the will to establish that it was not obtained through undue influence. *In re Estate of Jakiella, supra.*

¶ 45 There is no doubt that Mr. Angle suffered from Alzheimer's disease; however, the existence of that disease, in itself, does not establish incompetency to execute a legal instrument. *Weir by Gasper v. Estate of Ciao,* 521 Pa. 491, 556 A.2d 819 (1989). Since there are periods of lucidity with the disease, the relevant inquiry is whether at the time of the execution of the document, the decedent was lucid and competent. *Id.* A doctor's opinion on medical incompetence is not given particular weight especially when other disinterested witnesses establish that a person with Alzheimer's disease was competent and not suffering from a weakened intellect at the relevant time. *Id.*

¶ 46 In the present case, the orphans' court concluded that "the credible evidence does not support the contestants' assertions that he was dominated or manipulated by anyone, including the propo-

nents." Trial Court Opinion, 3/21/00, at 26. We concur. Appellants simply failed to establish the existence of influence in the first instance. We find particularly noteworthy the fact that Mr. Angle remained adamant about his wishes in all respects. Specifically, he bought a car despite attempts to influence him not to do so. He refused to submit to Martha's demands to remove her husband from the trailer on Two Top Road. He knew enough not to give Martha that property outright since she was not yet divorced from her husband, and he gave Martha the life estate despite the opposition of both Ronald and Mr. Steiger. Mr. Angle was a strong-willed man and that will is reflected in the 1997 document, which was not procured by the influence of anyone.

¶ 47 Unquestionably, Mr. Angle was experiencing difficulties with his business affairs; however, he asked for an attorney-in-fact, and Ronald performed only the task, payment of bills, that Mr. Angle wanted. Thus, no inference of undue influence arises from the execution of the power of attorney in favor of Ronald.

¶ 48 Furthermore, the evidence establishes irrefutably that the will reflected Mr. Angle's desires. Mr. Sanders and Mr. Steiger, two disinterested witnesses, testified that Mr. Angle wanted Martha and Libby to receive the houses because they did not own homes and his other children did. Ronald received the Hunter Road property because Mr. Angle wanted Ronald's sons to receive it eventually. These disinterested witnesses establish that it was Mr. Angle who wanted his property to be distributed as set forth in the 1997 will. Mr. Angle stated his reason for the distribution—his other children had their own homes. Mr. Angle's reason for leaving homes to Martha and Libby was grounded in reality in that his other children *did* have homes of their own. Furthermore

this desired distribution was announced before any symptoms of Alzheimer's disease appeared. Thus, we have no hesitation in concluding that the orphans' court correctly concluded that contestants had failed to present a *prima facie* case establishing that the favored distributions were procured by undue influence.

¶ 49 Appellants also maintain that the orphans' court erred in requiring them to establish that each of the proponents exercised undue influence over the decedent. Actually, the evidence fails to establish that any of the proponents exercised undue influence. There was no evidence of imprisonment of the body or mind, threats, fraud, misrepresentations, or any of the conduct necessary to establish the existence of undue influence. No one controlled Mr. Angle's free will. While there was testimony from the contestants that Libby was withholding contact with her children from her father until Mr. Angle gave her the house, Libby denied this assertion. As noted, the orphans' court makes credibility determinations, *In re Estate of Harrison, supra,* and it discounted contestants' testimony.

¶ 50 Appellants' next contention is that the court improperly required them to prove that Ronald abused his position as attorney-in-fact or exercised undue influence before it allowed the burden of proof to shift to proponents. This requirement was legally sound. The law is that the existence of a power of attorney will not raise the inference of a confidential relationship where the decedent sought that aid with his business affairs. *In re Estate of Ziel, supra.* In this case, the evidence, as credited by the orphans' court, established that Mr. Angle agreed with Libby that he needed help in handling his bills. Libby suggested Ronald handle the matter, Mr. Angle agreed, and Ronald always

operated within the parameters of the help requested by his father.

¶ 51 Appellants also argue that the orphans' court erred in requiring them to prove that decedent was the subject of domination or manipulation before shifting the burden of proof. Again, the court correctly applied the law. The elements of undue influence require the existence of a confidential relationship. A confidential relationship exists only where there is over-mastering influence on the part of the proponents. Influence is clearly defined in *In re Estate of Ziel, supra.* The orphans' court correctly applied the relevant law.

¶ 52 Appellants' final contentions are that the orphans' court was influenced by a number of irrelevant factors. Those irrelevant factors include the orphans' court's observations that 1) it was decedent's intent to favor some of his children based on the relative economic situation of all of his children; 2) Libby had cancer, and 3) Libby cannot repay the $30,000 loan from her father unless she receives the Hunter Road property. Appellants argue that these factors are totally irrelevant to the legal tests employed in this context, and the orphans' court's reliance on them demonstrates that it improperly applied the law.

¶ 53 As to the court's observations regarding the economic positions of the children, we note the following. Appellants challenged the validity of the will based both on undue influence *and* lack of testamentary capacity.

"The test for determining the existence of testamentary capacity, a quality every person *sui juris* is presumed to possess, is 'whether a man or woman has an intelligent knowledge regarding the natural objects of his bounty, the general composition of his estate, and what he desires done with it, even though his memory may have been im-

paired by age or disease.'" In re *Brantlinger's Estate,* 418 Pa. 236, 247, 210 A.2d 246, 252 (1965).

*In re Estate of Ziel, supra,* 467 Pa. at 536, 359 A.2d at 731.

¶ 54 Herein, Mr. Angle stated to his attorney that he wanted to make the favored dispositions to Martha and Libby because they did not have homes of their own and his other children did. This statement was highly relevant to establish that Mr. Angle was aware of the natural objects of his bounty and the composition of his estate, which did, in fact, include two homes. It was important that this statement be factually correct to establish Mr. Angle's competence. Thus, the orphans' court correctly considered this evidence.

¶ 55 As to the court's passing reference to Libby's cancer and economic condition, there is absolutely no indication that the court relied upon these factors in rendering its decision. They may have been factors in Mr. Angle's decision, which clearly was made of his own free will, to leave the Hunter Road property to Libby. However, the law in this Commonwealth is that a person may leave his property to whomever he wishes. The evidence establishes irrefutably that the April 1997 will reflects the *wishes of the decedent;* hence, we affirm the orphans' court's decision to uphold its probate.

¶ 56 Order affirmed.