## In re Schott Estate

C.P. of Allegheny County, no. 60 of 2001.

*F. Christopher Spina,* for Eisaman.
*Mark J. Hornyak,* for Woodcliffe Corp.

WECHT, *Register of Wills,* June 13, 2001—Harriet Schott, testatrix, a resident of Allegheny County, died on December 29, 2000, at the age of 92. Her death certificate lists "end stage dementia" as the cause of death. Testatrix left a 1993 will, and a 1997 will. This case involves a challenge to the validity of that second will, based upon asserted lack of testamentary capacity.

## BACKGROUND

Testatrix was pre-deceased in or around 1979 by her husband, William Schott. No children were born to that marriage.[1] Testatrix's only known surviving relatives are two children of her late sister. These nephews are Ronald M. Eisaman, a resident of Bethel Park, Allegheny County, Pennsylvania, and Jerry Eisaman, a resident of the St. Petersburg, Florida area.

On May 4, 1993, testatrix executed a will in which she named her nephew Ronald Eisaman as executor and sole heir. This case involves a challenge by Ronald Eisaman to the validity of a second will. That second will was executed by testatrix on June 3, 1997. In the second will, Ronald Eisaman's beneficial share was reduced to 50 percent, with the remaining 50 percent of the estate passing to Woodcliffe Corporation, which owns Woodcliffe Manor Personal Care Residence. Jerry

---

1. William Schott did have a son, William Schott Jr., from a previous marriage. Testatrix did not provide for this stepson in either her first or second will. Testimony herein indicated that William Schott had made provision for his son in a trust, and that testatrix knew this.

Eisaman, who testified in this will contest, is neither a named beneficiary (in either will) nor a party litigant.

Woodcliffe is an assisted living facility in Bethel Park, Pennsylvania. Woodcliffe is wholly owned by Ronald and Judy Cook, a married couple. The 1997 will designates Robert N. Peirce Jr., Esquire, as executor, and provides that he shall serve without fee.[2]

After her husband died, testatrix continued to live on Graham Boulevard in Wilkinsburg for a number of years. As she aged, and as her neighborhood began to suffer from increased crime and blight, Ronald Eisaman urged testatrix to move in with him and his family. In 1992, testatrix did so. In 1993, as noted, testatrix made the will designating Ronald Eisaman as executor, and leaving her entire estate to him.[3]

In 1995, after having broken her hip in a fall, and after her eyesight deteriorated significantly due to a condition known as macular degeneration, testatrix moved into Woodcliffe. In 1997, testatrix advised Mr. and Mrs. Cook that she wished to speak with a lawyer concerning her finances and concerning a stated desire (according to the Cooks) to get more control of those finances. Witnesses testified that Harriet wished to reduce the control that she felt Ronald Eisaman had gained over her finances. When Harriet asked Mr. Cook to recommend a lawyer,

2. On June 3, 1997, Harriet also executed a durable power of attorney appointing Mr. Peirce her attorney-in-fact. On August 14, 1987, Harriet had appointed Ronald Eisaman to this role.

3. Testimony indicated that the value of Harriet's estate is (or was) approximately $600,000, and that her late husband had conveyed another (additional) $400,000 through a trust to his son, William Schott Jr. (See *supra* n.1.)

Mr. Cook recommended Mr. Peirce, a one-time neighbor of the Cooks who had handled a real property assessment appeal for them in the past, and who had also represented Mr. Cook in an automobile accident case. Mr. Peirce thereafter visited Woodcliffe and consulted with testatrix. Subsequently, he wrote the 1997 will that is contested in this litigation.

## PROCEDURAL HISTORY

On January 3, 2001, Ronald Eisaman submitted the original of the 1993 will to this office, along with a petition for probate and grant of letters. Letters testamentary issued to Ronald Eisaman on that date. On January 19, 2001, Mr. Peirce submitted the original of the 1997 will to this office, along with a petition for probate and grant of letters, and a petition for citation to show cause why decedent's later will should not be probated. The petition for citation requested revocation of the letters issued to Mr. Eisaman, probate of the 1997 will, and issuance of letters to Mr. Peirce.

A citation was issued to Mr. Eisaman, who responded by filing an answer and new matter. Mr. Peirce then filed a reply to new matter. The parties subsequently filed trial briefs.

The testimonial and documentary evidence, as well as legal argument, were presented in a two-day will contest trial before me as register on April 20 and June 1, 2001, in accordance with 20 Pa.C.S. §3138.[4]

---

4. That section provides, in pertinent part:

"If a later will or codicil is submitted to the register for probate within three months of the testator's death but after the register shall

## DISCUSSION

Two issues are presented to me for decision:

"(1) Is the June 3, 1997 will facially valid?

"(2) If the June 3, 1997 will is valid on its face, did Harriet nonetheless lack testamentary capacity to execute that will?"

### (A) *Facial Validity of the June 3, 1997 Will*

As an initial matter, a will proponent bears the burden of proving execution of the proffered instrument by producing witnesses to its execution. See *J.* Brooke Aker, *Law of Wills in Pennsylvania,* §9.2C. (Bisel 1983 & Supp. 1999). Once this initial burden is met, and the prima facie validity of the will is established, the burden shifts to the party contesting the will. *Id.*

At trial, Mr. Peirce sought to meet this initial burden by introducing testimony of three witnesses: Mr. Peirce himself, Anna Marie Cubbage, and Joan Smith. Mr. Peirce, who was the will scrivener, brought Ms. Cubbage with him to the will execution. Ms. Cubbage was a legal secretary in Mr. Peirce's firm, and was also a licensed notary public. Her notarial seal appears on the 1997 instrument. Ms. Smith is a registered nurse employed by Woodcliffe. Mr. Peirce, Ms. Cubbage and Ms. Smith all testified that they were in Harriet's presence on June 3, 1997, at Woodcliffe for the execution of Harriet's will. Each witness testified that Harriet was alert and aware,

---

have probated an earlier instrument, the register . . . shall have power to open the probate record, receive proof of the later instrument or instruments and amend his probate record."

and each witness authenticated his/her subscribing signature on the instrument. Mr. Eisaman neither elicited nor adduced any evidence tending to disprove the facial validity of the 1997 instrument.

Accordingly, Mr. Peirce succeeded in shifting the burden to Mr. Eisaman. It then became Mr. Eisaman's burden to show that, notwithstanding its facial validity, the 1997 will was otherwise invalid.

### (B) *Testamentary Capacity*

The sole ground upon which Mr. Eisaman challenged the 1997 will was the claim that testatrix lacked testamentary capacity to execute that instrument. Mr. Eisaman made no allegation of undue influence, duress, fraud, or other grounds for legal challenge to a will. Accordingly, I address only testamentary capacity herein.

### THE LEGAL STANDARD

In *Estate of Reichel,* 484 Pa. 610, 400 A.2d 1268 (1979), our Supreme Court articulated the standard for testamentary capacity as follows:

"Testamentary capacity exists when the testator has intelligent knowledge of the natural objects of his or her bounty, the general composition of the estate, and what he or she wants done with it, even if memory is impaired by age or disease, and the testator need not have the ability to conduct business affairs [sic]." 484 Pa. at 614, 400 A.2d at 1270 (citing *Brantlinger Will,* 418 Pa. 236, 210 A.2d 246 (1965)).

Because a sound mind is the normal condition, capacity is presumed. *Allison's Estate,* 210 Pa. 22, 28, 59 A. 318, 321 (1904).

Accordingly, once proof of execution by two subscribing witnesses has been offered, the burden of proof shifts to the party contesting the instrument. Particularly where, as here, the scrivener and subscribing witnesses have testified to the testatrix's competency, the will contestant can sustain his burden of proof only by clear, strong and compelling evidence that the testatrix lacked testamentary capacity. *In re Estate of Kuzma,* 487 Pa. 91, 408 A.2d 1369 (1979).[5] Testamentary incapacity must be established in a positive manner, not in a doubtful one. *Lawrence's Estate,* 286 Pa. 58, 70, 132 A. 786, 791 (1926). Our Superior Court recently reaffirmed the stringency of this standard in *In re Estate of Angle,* 777 A.2d 114, 123 (Pa. Super. 2001), in which the court found that the testator possessed testamentary capacity at the time of will execution despite the fact that there was "no doubt" that the testator suffered from Alzheimer's disease.

## THE EVIDENCE

Mr. Peirce, the attorney-scrivener, testified concerning his meetings with testatrix in 1997. He testified that she was lucid, and that she appeared clearly to understand the scope and nature of her assets, as well as the objects of her bounty. He testified that she was clear in her desire to benefit Woodcliffe in gratitude for the care she had received there. He testified that she was frail, and essentially blind, but that her physical condition ap-

---

5. Accord, *Kerr v. O'Donovan,* 389 Pa. 614, 134 A.2d 213 (1957); *Franz Will,* 368 Pa. 618, 622, 84 A.2d 292, 295 (1951); *Sturgeon Will,* 357 Pa. 75, 81, 53 A.2d 139, 142 (1947).

peared otherwise to be fine. As to her mental state, Mr. Peirce testified that she was bright, alert, and aware of both her surroundings and of her dispositive assets. Anna Marie Cubbage, Mr. Peirce's secretary and notary, corroborated Mr. Peirce's testimony concerning Harriet's awareness and comprehension.

Joan Smith, the nurse-employee at Woodcliffe, testified that she was present during the entire conversation between testatrix and Mr. Peirce. She testified that testatrix was clear in her knowledge of the approximate size of her estate and in her desire to divide that estate in even halves between her nephew (Mr. Eisaman) and Woodcliffe. Ms. Smith testified that Harriet's communication difficulties did not become severe until approximately the last eight months of her life, and that, in June 1997, she was alert, opinionated, interested in current events, and very direct. Ms. Smith further testified that Harriet feared that Mr. Eisaman was misusing estate assets.

In support of his claim that Harriet lacked testamentary capacity, Mr. Eisaman submitted a transcript of Harriet's testimony in the guardianship proceedings that Mr. Eisaman commenced in August 1997. In that testimony, given before the Honorable Robert A. Kelly (then the administrative judge of the orphans' court division) on September 16, 1997, Harriet seemed largely aware of herself and her surroundings, but was somewhat confused, particularly as to the amount of her assets. (September 16, 1997 tr. at 13-14.) She did corroborate Mr. Peirce's claims that she had grown suspicious of her nephew, Mr. Eisaman (*id.* at 15), and that she intended

to benefit the Cooks in her will. (*Id.* at 18-19.) Standing alone, Harriet's September 1997 testimony provides inadequate information upon which to predicate a dispositive ruling on the issue of her testamentary capacity three months earlier.

Mr. Eisaman also presented the testimony of Amy Roy, who is one of his two daughters. Ms. Roy testified that she knew Harriet for 25 years and that she and her family had a close relationship with Harriet. She testified that her father had always taken care of Harriet and that she accompanied her father frequently when he went to visit Harriet at Woodcliffe. Ms. Roy testified that Harriet was confused as to the ownership of Woodcliffe, and that Harriet confused the identities of Ronald Cook and Ronald Eisaman. Ms. Roy testified that, in spring 1997, Harriet thought that her bed was exploding, that there were children in the yard crying, that armless children were in the house, and that there were "seeds in her rectum." Ms. Roy testified that, as of midsummer 1997, she and her father were barred from visiting Harriet in her room at Woodcliffe, and that Woodcliffe employee Joan Smith would instead always bring Harriet downstairs, where a staffer would stand nearby while the family members met. On cross-examination, Ms. Roy conceded that Harriet would differentiate between Ronald Eisaman and Ronald Cook once the difference was made clear to her, but Ms. Roy insisted that Harriet's clarity on this and other matters was "in and out."

In May 1997, Harriet requested a mental examination by Brian Deyarmin M.D., a family practitioner whose group provides medical care to Woodcliffe's residents.

On or around May 17, 1997, Dr. Deyarmin performed a "mini mental status examination" upon Harriet. He provided a written report of his findings to Mr. Peirce on July 16, 1997. On September 2, 1997, Dr. Deyarmin testified by deposition in the guardianship proceedings. The transcript of that deposition was introduced in this will contest. Dr. Deyarmin stated that Harriet "performed very well" on the exam. He also stated that "her only limitations" were due to her visual impairment, and that she exhibited "some deficit in long-term recall." Dr. Deyarmin concluded that "[o]verall the results . . . showed no evidence of dementia at this point."

Mr. Eisaman also submitted the transcript of testimony given by his late wife, Carol Lee Eisaman, on September 9, 1997, during the above-mentioned guardianship proceedings. (Ms. Eisaman died on March 31, 2000.) Ms. Eisaman worked for many years as a nurse, including substantial experience in psychiatric care facilities. Ms. Eisaman testified that, from the time Harriet moved into the Eisaman home until she moved into Woodcliffe in 1995, Ms. Eisaman was very concerned about the wide array of prescription drugs that Harriet was taking, as well as Harriet's tendency to ingest incorrect dosages of those drugs. Ms. Eisaman also testified that she had performed and scored many mini mental status examinations, which she defined as "screens." (September 9, 1997 tr. at 35.) She testified that Harriet's score of only one out of three on the recall section of the exam was a cause for concern. (*Id.* at 37.) She also testified that the mini mental status examination had really just assessed Harriet's "orientation," and that further testing would be

needed to test "higher executive functioning" as well as "judgment and insight." (*Id.* at 39.) However, Ms. Eisaman conceded on cross that Harriet had scored 25 out of 27 on the mini mental status examination, and that this was a "pretty good score for an 89-year-old person." (*Id.* at 41.)

Ronald Eisaman testified at length. He testified that he knew his aunt Harriet for 50 years, and that he became closely involved with her when her husband died. He was in contact with her weekly, and his wife, Carol, helped her with her medications. As noted, Harriet moved in with the Eisamans as her neighborhood deteriorated and her eyesight worsened. Mr. Eisaman testified to a decline in Harriet's mental state. After moving into the Eisaman home in Bethel Park, Harriet often misplaced or forgot her checks and her cash. She would sometimes wander around the house at night and walk right into the master bedroom. At one point she claimed to hear people screaming in the yard.

Mr. Eisaman testified that, at Harriet's suggestion, Harriet paid the Eisamans for the care and upkeep she was receiving. In 1994 or 1995, Harriet fell in her bedroom and broke her hip, requiring a replacement. Mr. Eisaman testified that Harriet was totally disoriented, and did not know where she was. He also testified that she continued to hallucinate after she began rehabilitation for her hip, and that these hallucinations included the belief that she was hearing screaming cats. Following her inpatient rehabilitation, Harriet moved into Woodcliffe, which charged double or more than the Eisamans. Mr. Eisaman visited daily.

When Harriet revoked Mr. Eisaman's power of attorney, Mr. Eisaman heard about it from Harriet's bank. Mr. Eisaman testified that Harriet was often confused and disoriented throughout the period of 1995 to 1997, and that Harriet became angry with Carol Eisaman because Carol withheld drugs from Harriet in an attempt to wean her from what Carol viewed as a dangerous dependency. Ronald also testified that Harriet had no idea that she had executed a power of attorney and a will on the same day in 1997, and that Harriet had told him that Mr. Peirce suggested to her that 50 percent of her estate was more than enough for Ronald.

On cross-examination, Ronald testified that Harriet had told him that, instead of giving him $10,000 in return for extensive work he'd done to prepare her Wilkinsburg home for sale, she would give him her estate in her will. Ronald also testified that previous wills had divided Harriet's estate into even thirds for Ronald, his brother Jerry, and their mother (Harriet's sister) who died in 1993. Ronald conceded on cross-examination that he did not petition to have Harriet declared to be an incapacitated person prior to 1997, despite the pre-1997 infirmities to which he testified. Ronald asserted that, at the time that he filed the incapacity petition, he did not yet know that Harriet had changed her will. He denied becoming angry when notified that Harriet had done so.

Mr. Eisaman also submitted the transcribed testimony of Tod R. Marion, who had testified in the guardianship proceedings. Mr. Marion, a psychologist and the director of geriatric services at St. Francis Medical Center, testified that the mini mental status examination per-

formed on Harriet showed "some memory deficit." (September 9, 1997 tr. at 48.) He also testified that the exam does not evaluate "executive function measures, which are the highest level of functions." (*Id.*) Mr. Marion defined these as planning, evaluation and organization, and stated that Harriet's virtual blindness precluded any testing of these functions. (*Id.* at 48-49.) Mr. Marion challenged the claim that Harriet had scored well on the mini mental status examination. He testified that her score was not a normal score, and that the full exam was not done.[6] Mr. Marion accordingly recommended that further testing be done to determine the extent of Harriet's impairment and to determine whether Harriet had capacity to sign a durable power of attorney on June 3, 1997.

Judge Kelly ordered a neuropsychological evaluation, which was performed by Michael McCue Ph.D. on December 29, 1997, and January 5, 1998. Following that evaluation, which resulted in a written report by Dr. McCue, Judge Kelly entered an April 6, 1998 order of court appointing plenary guardians of the person and of the estate. The order adjudicated Harriet to be "a totally incapacitated person." The April 6, 1998 order further appointed Ursuline Services as plenary permanent guardian of the person, and Smithfield Trust Company as plenary permanent guardian of the estate. Both guardians

---

6. Mr. Marion testified:

"I would suggest that the evidence that there is a memory impairment suggests there's something going on here. We don't know what that is and we don't know what the impact of that memory impairment is on her ability to do more formal kind of executive function kind of things to evaluate her circumstances." (September 9, 1997 tr. at 50.)

were directed to consult with Harriet and take her wishes into account prior to any decision-making.

Dr. McCue's trial deposition was taken in this matter on April 10, 2001. In deposition, Dr. McCue discussed his 1998 report which had described Harriet's substantial visual impairment and significant memory deficit. In his report for Judge Kelly, Dr. McCue diagnosed a "probable dementia" of "mild severity." In his report, Dr. McCue concluded that, if she was fully informed, and if adequate accommodations for her impairments were made, Harriet would be able to understand basic information regarding financial decisions, including power of attorney. Dr. McCue's report further stated that, while Harriet could not manage her finances, she could make judgments regarding her finances and regarding power of attorney. While equivocal on some points, Dr. McCue's trial deposition generally expanded upon, and substantially corroborated, his 1998 report.

Douglas Sherratt also testified at the will contest trial. Mr. Sherratt is the president of Smithfield Trust Company. As noted, Judge Kelly appointed Smithfield Trust guardian of the estate in his April 1998 order adjudicating Harriet an incapacitated person. Mr. Sherratt testified that he visited Harriet in April 1998, shortly after Smithfield's appointment as guardian. He also testified that he spoke with her by telephone on two or three occasions. He testified that Harriet knew who she was, where she was, and what her assets were. Mr. Sherratt stated that, while Harriet's eyesight was poor, she did not appear delusional, nor did she indicate communications with imaginary voices.

I permitted two witnesses to testify by telephone. The first was Jerry Eisaman, who is Ronald Eisaman's 63-year-old brother and Harriet's other surviving nephew. Jerry, who grew up in Allegheny County but has spent all of his adult life elsewhere, is a retired ballplayer now living in Seminole, Florida (near St. Petersburg). He testified that he kept in touch with Harriet regularly, over the years by telephone, and that he visited her in person twice since her husband's death. He also testified that his brother Ronald initially told him that the two of them would split Harriet's estate, but reversed this statement in a 1993 conversation in which Ronald said that Ronald would be taking all of the estate.

Jerry testified that, sometime thereafter, Harriet told him she was making a will and that she planned to "do something" for Woodcliffe in that will. She also offered, according to Jerry, to provide for him. Jerry stated that he twice declined this offer. Jerry testified that Harriet was "glad" to be out of Ronald's house and into Woodcliffe, and that she knew who Ronald and Jerry were. Jerry acknowledged that Harriet deteriorated significantly in the last year of her life (2000), but stated that she was well aware of herself and her actions at the time her second will was made in 1997.

William H. Schott Jr., was the other witness who testified at trial by telephone. William is 73 and lives in Bellefonte, Centre County, Pennsylvania. He is the surviving son of the late William H. Schott and the late Alice Schott Silverman. His parents divorced when he was 4 or 5. His father remarried twice; Harriet was his father's third wife. William was 15 or 16 when Harriet married

his father. William has had infrequent contact with Ronald and Jerry over the years, but he talked with Harriet by telephone "every few months." These telephone conversations continued until the summer of 2000. William did not find Harriet to be delusional or disoriented during these telephone conversations. In the summer of 2000, William detected a change in Harriet's mental status. At that time, he began to communicate by telephone with Judy Cook rather than with Harriet directly. William testified that he never discussed wills with Harriet; his late father had provided for him in a trust.[7]

Judy Cook, Woodcliffe's co-owner, also testified. She described Harriet as "feisty," with a "strong personality" and "a good sense of humor." She also described Harriet as "a bit of a loner." A layperson who has been in the personal care business for 15 years, Ms. Cook testified that she is familiar with the effects of aging on mental processes. She stated that in 1997, Harriet knew who she was, kept up with the news, played with the Cooks' dog, and chose to refrain from involvement in group activities with other Woodcliffe residents. Ms. Cook testified that Harriet needed nursing care because of her macular degeneration and her broken hip, not because of mental infirmities. Ms. Cook stated that, after Harriet changed her will in 1997, the frequency of Ronald's visits to Harriet at Woodcliffe tapered off. (On rebuttal, Ronald Eisaman testified that the reason that his visits trailed off was that he and his wife received a letter from E.J. Strassburger, Esquire (see below) admonishing them not to talk with Harriet.)

---

7. See *supra* nn.1 and 3.

Ms. Cook testified that, prior to Harriet's execution of the 1997 will, Harriet expressed dissatisfaction with Ronald Eisaman and his handling of her finances, and stated that she would change her will. Ms. Cook stated that she and her husband first became aware of the bequest to Woodcliffe when Mr. Peirce told them immediately after meeting with Harriet at Woodcliffe in 1997. Ms. Cook acknowledged that the personal care business has been profitable for her and her husband. However, she testified, that, in 15 years, only one other resident has made a testamentary bequest to Woodcliffe, and that the bequest was approximately $40,000.

Ronald Cook also testified. He corrected his wife as to the number of testamentary bequests that Woodcliffe received from residents before Harriet's gift; in addition to the $40,000 bequest that Judy Cook recalled, Woodcliffe also received a $15,000 bequest. Mr. Cook testified that neither he nor his wife asked for money from any of these benefactors, and further testified that the $15,000 benefactor was a resident who had been abandoned by her family and who had, for a time, been taken into the Cooks' home. Mr. Cook worked in the construction industry until recently, and worked at Woodcliffe during evenings and weekends. He and Harriet had frequent conversations on various topics, including current events. Mr. Cook testified that, from 1995 to 1997, Harriet was very sharp and exhibited no major changes in mental status or memory.

Mr. Cook testified that, in 1997, Harriet told him that Ronald Eisaman had control of her money, and that she wanted to get the control back. She asked Mr. Cook to

recommend an attorney. He recommended Mr. Peirce. She asked him to call Mr. Peirce, and he did so. She told Mr. Cook that she needed control of her money, but she made no specific mention of a will. Mr. Cook did not sit in on either of Mr. Peirce's meetings with Harriet. Like his wife, Mr. Cook testified that he never asked Harriet for a bequest, and that he learned of the bequest when Mr. Peirce told him. He also testified that, in June 1997, Harriet was not exhibiting delusional behavior, and that she knew who she and others were.

E.J. Strassburger, Esquire, also testified. Mr. Strassburger is the attorney that Judge Kelly appointed in 1997 to represent Harriet in connection with the guardianship/incapacitated person proceedings. During an eight- to 10-month period in 1997 and 1998, Mr. Strassburger had three face-to-face meetings with Harriet, and approximately six telephone conversations. He testified that Harriet knew who she was, who he was, and who Mr. Peirce was. He further testified that he discussed her plans with her, and that she understood her assets and her bequests. He noticed her eyesight problem, but observed no memory problem. Mr. Strassburger described Harriet as "sharp," "sweet" and, for a person in her eighties, "together." He stated that she "knew what was going on." Mr. Strassburger testified that he never observed delusional behavior on Harriet's part, and never heard her say that she heard voices.

## ANALYSIS

In *Weir by Gasper v. Estate of Ciao*, 521 Pa. 491, 502, 556 A.2d 819, 824 (1989), our Supreme Court held that

"[t]he testimony of persons who observed the alleged incompetent on the date in question is generally superior to testimony as to observations made prior to and subsequent to that date." The court held that the trial court was entitled to rely for its finding of a person's mental competence on the testimony of the attorney who handled the transactions, notwithstanding a contrary opinion rendered by a psychiatrist who examined the person seven months later. In *In re Estate of Angle, supra,* our Superior Court recently affirmed the trial court's finding of testamentary capacity despite the fact that there was "no doubt" that the testator suffered from Alzheimer's disease. 777 A.2d at 123. The court held:

"Since there are periods of lucidity with the disease, the relevant inquiry is whether at the time of the execution of the document, the decedent was lucid and competent. . . . A doctor's opinion of medical incompetence is not given particular weight especially when other disinterested witnesses establish that a person with Alzheimer's disease was competent and not suffering from a weakened intellect at the relevant time." *Id.* (citation omitted)

It cannot be doubted that, by the year 2000, Harriet Schott was seriously impaired in her mental capacity. Nor can it be doubted that, at the time she made her second will in June 1997, she had some memory deficit. But the evidence in this case shows that a substantial deterioration occurred in the last three and one-half years of Harriet's life, and particularly in the last several months of her life. What the record does *not* show is that, in June 1997, Harriet lacked testamentary capacity. It certainly

does not show that by the clear and convincing evidence required by our law. Robert Peirce testified at length concerning Harriet's alertness and awareness at the time of execution of the June 1997 will. The witnesses to the will execution, Ms. Cubbage and Ms. Smith, testified to the same proposition.

That is not to say that all witnesses herein were disinterested. Indeed, counsel for the respective parties sought to demonstrate the interests held by various witnesses. Mr. Peirce, though serving without fee as executor, also served as attorney-scrivener. A former neighbor of the Cooks, he had done legal work for them in the past. Execution witness Cubbage is employed by Mr. Peirce. Mr. Peirce testified that he had used Smithfield Trust Company, Douglas Sherratt's firm, in the past. Execution witness Smith is employed by Ronald and Judy Cook, owners of beneficiary Woodcliffe. Jerry Eisaman is obviously estranged from his brother Ronald.[8] The stake of Mr. and Mrs. Cook, as beneficiaries under the 1997 will, is obvious. On the other side, the opposing stake of Ronald Eisaman, his late wife Carol Eisaman, and their daughter Amy Roy, is equally obvious. But the fact of

---

8. Counsel for Mr. Peirce argued in closing that Jerry Eisaman was particularly credible because he testified against his own interest. Counsel argued that, had Jerry Eisaman testified that Harriet lacked mental capacity instead of testifying (as he did) that she possessed such capacity, then Jerry would have stood to inherit half of Harriet's estate. The argument is incorrect. If the 1997 will is denied probate, then the probate of the 1993 will stands. There is no claim that Harriet lacked testamentary capacity in 1993. Accordingly, there would be no intestacy, and the 1993 will (conveying the entire estate to Ronald Eisaman) would control asset disposition. Jerry would inherit nothing in either scenario.

interest in the outcome of a case must only be recognized and factored into decision; interest, in itself, is not disqualifying. Moreover, while there was some emotion in this case, I find that, as a general matter, all of the actors in this drama proceeded with good intentions and sought to maximize Harriet's well-being.[9] But, despite good motives, interests inevitably collided. There was, after all, much at stake.

While the interests of expert witnesses Mr. Marion, Dr. Deyarmin, and Dr. McCue, were presumably close to neutral, their testimony was, as noted, equivocal. The expert testimony did not establish lack of testamentary capacity by clear and convincing evidence. But the testimony of other disinterested witnesses was not equivocal. E.J. Strassburger, appointed by the court to represent Harriet, deemed her alert and aware. William Schott Jr., though mostly in touch with Harriet by telephone rather than in person, also found her to be lucid.

In accordance with *Weir* and *Angle,* to the extent that Dr. McCue's testimony (particularly his deposition, more than his report) cast any doubt on Harriet's mental capacity, the fact that he did not examine Harriet until six or seven months after the June 3, 1997 will execution

---

9. For example, although cross-examination sought to challenge Mr. Peirce on a number of grounds, no allegation of undue influence, fraud or duress was pled. No claim of a conspiracy was made or proven. And although some witnesses suggested that Ronald Eisaman had drained assets from Harriet's estate in the years before her death for the benefit of him or his family, I do not believe that these suggestions were established by adequate proof, and I found Ronald to be sincere in his concern for Harriet. That does not mean that Ronald would not want all, rather than half, of Harriet's money now. But, again, there is nothing inherently disqualifying in interests of this kind.

weakens the force of his testimony in comparison to that of the witnesses who could (and did) testify to Harriet's condition in June. In fact, this contest, although difficult, is not as close a case as *Weir* or *Angle.* That is because here, unlike in those cases, the expert testimony was equivocal. Taken alone or taken together, the testimony of neither Mr. Marion, nor Dr. Deyarmin nor Dr. McCue could suffice—even if uncontested by lay witnesses who observed Harriet on June 3, 1997—to establish lack of testamentary capacity clearly and convincingly.

Nor can the testimony of Ronald and Carol Eisaman and their daughter Amy Roy suffice to establish lack of testamentary capacity. While these witnesses testified to various delusions Harriet allegedly exhibited on occasion, their testimony was contested by several other witnesses who denied observing such behavior at any time. All of these witnesses may nonetheless be truthful in their respective recollections, for there was never any suggestion that Harriet lived in a state of constant delusion or confusion. And this ties in to an important point. It is well settled that, to possess testamentary capacity, a testator need only be lucid at the time of will execution. See *e.g., In re Estate of Clark,* 461 Pa. 52, 64, 334 A.2d 628, 634 (1975). There was no competent evidence that Harriet lacked this lucidity on June 3, 1997, and there was competent evidence that she possessed it on that date. Moreover, Carol Eisaman's own testimony tended to suggest that the delusional behavior Harriet allegedly exhibited on occasion may well have been traceable to a dependency on medications that Harriet self-administered

carelessly or incorrectly, and from which Carol weaned (or sought to wean) her.

To be sure, the April 1998 order adjudicating Harriet an incapacitated person and appointing guardians is some evidence in this will contest. But it is only some evidence. First, the order is dated April 6, 1998, 10 months after June 3, 1997. Second, an adjudication of incapacity, with appointment of guardians, is different from an adjudication of lack of testamentary capacity. The first adjudication is aimed at preserving the person and the estate of a person unable, partly or wholly, to manage for himself.[10] The second adjudication is aimed at substituting an earlier dispositive scheme (or an intestacy) for the testator's latest will because clear and convincing evidence has been adduced to show that the testator lacked intelligent knowledge of one or more of the following: (1) the natural objects of his bounty; (2) the general composition of the estate; or (3) what the testator wants to do with that estate.[11] I find, on the record presented to me, that the grounds for such an adjudication are lacking.

An informative comparison may be made to the case of *Sniderman Will*, 20 Fiduc. Rep.2d 119 (Reg. of Wills Allegheny Cty., December 23, 1999). In that case, I refused to probate a will made by a testatrix who had been adjudicated an incompetent by the orphans' court three

10. See 20 Pa.C.S. §5501:

" 'Incapacitated person' means an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety."

11. See cases cited *supra* ("The Legal Standard").

and one-half years earlier. The will proponents (who were substantially, but not completely, identical to those who had sought and obtained the guardianship) failed to show how and why the testatrix had recovered from her preexisting incompetency. In this case, by contrast, Ronald Eisaman seeks to relate the April 1998 incapacity back to the June 1997 will execution so as to divest the testatrix of testamentary capacity retrospectively. For the reasons stated, I decline to do so.

## CONCLUSION

Upon this record, I find that Ronald Eisaman has not met his burden to show by clear and convincing evidence that testatrix Harriet Schott lacked testamentary capacity to execute the will dated June 3, 1997. Accordingly, the petition of Ronald and Judith Cook will be granted. The letters previously issued to Ronald Eisaman will be revoked, and letters will be issued to Robert Peirce in accordance with the June 3, 1997 will. An order in accordance with this opinion follows.

## ORDER

In accordance with the foregoing opinion, it is hereby ordered and decreed, June 13, 2001, that the letters testamentary previously granted herein to Ronald M. Eisaman are revoked, and that same shall be surrendered to the register of wills, along with any unused short certificates. It is also ordered and decreed that the will dated June 3, 1997, is admitted to probate, and that letters testamentary shall be granted to Robert N. Peirce Jr., Esquire.