J-A01010-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ESTATE OF EVELYN F. SCHERMER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: MARC A. SCHERMER, EXECUTOR | No. 366 WDA 2016 |

Appeal from the Order February 12, 2016
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): 5043 of 2011

BEFORE: BOWES, OLSON AND STRASSBURGER,* JJ.

MEMORANDUM BY BOWES, J.:                    **FILED: OCTOBER 2, 2017**

Marc A. Schermer appeals the ruling of the orphans' court that sustained an appeal from probate and invalidated a will[1] on the ground that it was procured by Marc's undue influence. We affirm.

On August 13, 2011, then eighty-seven-year-old Evelyn F. Schermer ("Evelyn" or "Decedent") died of cancer. She was survived by three sons, Gary, the eldest, Marc, the middle son, and Leland, the youngest son. Gary and Leland are the Appellees herein.[2] On August 16, 2011, a document

---

[1] We have jurisdiction over this appeal under Pa.R.A.P. 342(a)(2), which permits an appeal to be taken as of right from the decision of an orphans' court "determining the validity of a will[.]"

[2] Gary and Leland have objected to Marc's standing to pursue this appeal. Appellees' brief at 2 n.4. Marc purported to file this appeal in his capacity as executor. As our Supreme Court observed in **In re Estate of Hain**, 346
*(Footnote Continued Next Page)*

---

* Retired Senior Judge assigned to the Superior Court.

dated June 7, 2010, was admitted to probate as Decedent's last will and testament and letters testamentary were issued to Marc.

Gary and Leland filed a timely appeal to the orphans' court from probate, maintaining that the will was invalid based upon Evelyn's lack of testamentary capacity when it was executed and because it was procured by undue influence exerted by Marc. The orphans' court conducted nine hearings and thereafter determined that the will was procured by undue influence. Marc filed exceptions to that decision;[3] they were denied on

*(Footnote Continued)* _____

A.2d 774, 776 (Pa. 1975), "Unless an executor has been surcharged or has been ordered to distribute more than the admitted balance in the estate, the executor is not a 'party aggrieved' by the final order or decree of the orphans' court. The executor is merely a holder of the estate's assets for the purpose of administration and distribution . . . ." **See also In re Faust's Estate**, 73 A.2d 369 (Pa. 1950) (holding the executor cannot, at the estate's expense, employ legal counsel for purposes of a will contest because executor is not a party to a will contest). However, Marc does have standing in his individual capacity in that he was aggrieved by the order invalidating the will, and we therefore can reach the merits of this appeal. **Hain**, **supra**; **But see Estate of Karahuta**, 393 A.2d 22 (Pa. 1978) (quashing an appeal by co-executors where order in question determined who should benefit under the will). In this case, Marc filed his exceptions in his capacity as executor, and Appellees raised no issue to his standing in that respect. Hence, we conclude that their present objection is waived, as it was not raised in the lower court proceedings.

[3] We observe that the new rule pertaining to exceptions in orphans' court proceedings, Pa.O.C.R. 8.1, did not take effect until September 1, 2016, after completion of the final adjudication and filing of this appeal. That rule now states: "Except as provided in Rule 8.2 [relating to motions for reconsideration], no exceptions or post-trial motions may be filed to any order or decree of the court." Pa.O.C.R. 8.1.

February 12, 2016. This timely appeal followed. Marc raises the following contentions.

[1.] Whether the Orphans' Court erred as a matter of law in giving decisional weight to the testimony of three of the individuals who cared for the Decedent in her final years ("caregivers") demonstrating the Testatrix showed signs of forgetfulness, confusion and repeating herself, where the caregivers were indefinite regarding when the instances of forgetfulness and confusion occurred relative to the actual signing of the probated Will, but unanimously testified the Decedent's forgetfulness and confusion became distinctly worse seven months after the Testatrix executed the probated Will.

[2.] Whether the Orphans' Court erred as a matter of law by affording limited or no evidentiary weight to the credible testimony of the Scrivener of the probated Will, on the theory the attorney had only met the Testatrix "on limited occasions in an office setting," where the record reveals the attorney had worked with the Testatrix on several matters over a two year period, was specifically consulted by the Testatrix on the matter of the ongoing conflict with her two sons, and who advised the Testatrix regarding the Will in which the Decedent disinherited the Petitioners.

[3.] Whether the Orphans' Court erred as a matter of law in disregarding all expert testimony presented below, on grounds the expert opinion of an internist called by the Petitioners had been "opposite" the opinion of a psychiatrist called by the Estate, where the internist admitted he did not understand the legal concept of "weakened intellect," only testified that conditions from which the Testatrix had suffered "could" or "might" cause cognitive impairment, and never testified that in his opinion the Testatrix actually suffered from "weakened intellect" on or before the date the Testatrix executed the probated Will.

[4.] Whether the Orphans' Court capriciously disregarded evidence in the course of finding the Testatrix's decision to disinherit two of her sons was presumptively due to undue influence, where the Testatrix had decided to specially benefit Marc Schermer in a will drafted years before any evidence of "weakened intellect" was shown, and repeatedly declared to her

- 3 -

attorney and in the probated Will that her decision to disinherit the Petitioners was due to "the pain and heartache [the Petitioners] have caused me by their actions" in trying to force the Decedent to change her settled purpose to benefit Marc Schermer, and the Testatrix's beliefs, even if mistaken, were rational under the circumstances.

Appellant's brief at 5-6.

We are duly cognizant of the applicable standard of review in these matters:

> Our standard of review of the findings of an Orphans' Court is deferential.
>
> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion.
>
> However, we are not constrained to give the same deference to any resulting legal conclusions.
>
> *In re Estate of Harrison,* 745 A.2d 676, 678–79 (Pa.Super. 2000), *appeal denied,* 563 Pa. 646, 758 A.2d 1200 (2000) (internal citations and quotation marks omitted). "The Orphans' Court decision will not be reversed unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law." *In re Estate of Luongo*, 823 A.2d 942, 951 (Pa.Super. 2003), *appeal denied,* 577 Pa. 722, 847 A.2d 1287 (2003).

*In re Fiedler*, 132 A.3d 1010, 1018 (Pa.Super. 2016) (emphasis added).

The issues on appeal implicate the well-known doctrine of undue influence. We observed in *In re Estate of Smaling*, 80 A.3d 485, 497

- 4 -

(Pa.Super. 2013) (*en banc*) (citing **In re Ziel's Estate**, 59 A.2d 728 (Pa. 1976)), "A party claiming undue influence must establish, by clear and convincing evidence, that: (1) when the will was executed the testator was of weakened intellect and (2) that a person in a confidential relationship with the testator (3) receives a substantial benefit under the will." In the present case, none of the contentions raised on appeal challenges the orphans' court determination that Marc was in a confidential relationship with the Decedent, and the record contains evidence of the same. Similarly, there is no averment raised that Marc did not receive a substantial benefit under the June 7, 2010 will.[4] Thus, the sole issue before this Court is whether the evidence of record supports the conclusion of the orphans' court that Evelyn suffered from a weakened intellect on June 7, 2010.

As to that inquiry, the **Smaling** Court elucidated, "The weakened intellect necessary to establish undue influence need not amount to testamentary incapacity." **Smaling**, **supra** at 498. While there is not a "bright-line test by which weakened intellect can be identified to a legal certainty," a testator suffered from weakened intellect if he or she exhibited "persistent confusion, forgetfulness and disorientation." **Id**. Since undue influence is often exerted by "a gradual, progressive inculcation of a

---

[4] At oral argument before this panel, Marc acknowledged that he was not contesting on appeal either that he was in a confidential relationship with Evelyn or that he obtained a substantial benefit under the probated will.

receptive mind," the benefit from undue influence may only manifest itself after a period of manipulation of the decedent. *Id*. Thus, for purposes of undue influence, "the particular mental condition of the testator on the date he executed the will is not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity. More credence may be given to remote mental history." *Id*.

The pertinent facts follow.[5] Between 1984 and 2010, Evelyn executed ten different wills. In 1994, a will was prepared for her by Ed Grinberg, but she did not sign that document. Of the ten wills that Evelyn did execute, seven were prepared in the final five years of her life, and Marc took his mother to the various attorneys who drafted them. In the nine testamentary dispositions executed prior to June 7, 2010, Evelyn left her residuary estate equally to her three sons. Wills that the Decedent executed in 1984 and 1988, as well as the unsigned will that was prepared in 1994 by Mr. Grinberg, stated that any money or loans received from Evelyn by Marc or any of his companies would be accounted for at the time of the distribution of the residuary estate and treated as advancements. A 2001

---

[5] This narrative is gleaned from the evidence adduced by Gary and Leland, who prevailed in the orphans' court. We observe that, based upon glaring inconsistences that Marc related, the orphans' court specifically found that Marc was not a credible witness. Trial Court Opinion, 11/30/15, at (unnumbered pages) 7-8. Accordingly, we discount any testimony that he proffered.

will was the first one that failed to treat those loans as advancements. As of 2001, Evelyn had loaned Marc approximately $140,000. Gary and Leland were unaware of any of the wills executed after 1988, but they knew about the 1994 will, which continued to treat Evelyn's loans and gifts to Marc as advancements, and, until 2008, Gary and Leland believed that Evelyn had executed the 1994 Grinberg will.

In the June 7, 2010 probated will, the Decedent disinherited Gary and Leland as well as their issue, and she left her residuary estate entirely to Marc, to his wife Marjorie if Marc were deceased, and then to his daughter if both Marc and Marjorie were deceased. Evelyn stated, "I leave no portion of my property and estate to my sons, LELAND SCHERMER and GARY SCHERMER, or their issue. I take this action [as] a result of their behavior towards me and the pain and heartache they caused to me by their actions[.]" Last Will and Testament of Evelyn F. Schermer, 6/7/10, at 1. Evelyn recited in the will that the actions undertaken by Gary and Leland that caused her pain included "suing my son Marc, alienating my grandchildren from me, using my grandchildren to try to cause me to make changes to my will, and failing to respect my wishes in handling my property and estate."

The June 7, 2010 will definitively stated that, during her life, Evelyn had forgiven any loans that she made to Marc and any company that he had owned. The will ratified the *inter vivos* loan forgiveness, confirming that

there was no valid outstanding indebtedness owed to her by Marc so that the loans were not to be treated as advancements. That will also provided that stock that Evelyn had given to Marc was not to be treated as an advancement.

Marc claimed that he was left the entirety of Evelyn's estate because she was estranged from Gary and Leland and their families. Marc maintained that Evelyn's estrangement from Gary and Leland occurred because Gary and Leland and their children tried to coerce Evelyn into changing a will that Evelyn made on November 7, 2007. *See* Appellant's brief at 51 (Evelyn "executed the probated will in reaction to the machinations of Gary and Leland Schermer and their children, trying to force the Decedent to change an earlier will."). Gary and Leland presented evidence, credited by the orphans' court, that they were not estranged from their mother, that their children were not estranged from Evelyn, and that neither they nor their children tried to **force** Evelyn to change her testamentary disposition.

The following background is relevant. Evelyn's husband Joseph was the father of Gary, Marc, and Leland (the "brothers"). In 1982, Joseph worked at and co-owned a family-owned business, Feldman Brothers Company, Inc. ("Feldman"), which was started by Evelyn's father Herman and Herman's brother. In 1982, Marc worked at Feldman with his father and other family members. That year, Herman died and Joseph died eight

months later. At the time, Gary worked in the City of Pittsburgh Public Schools as a teacher. After earning a law degree, Gary continued to work for the school district until he retired. Gary had three sons and a stepdaughter: Evan (a tennis pro in Hawaii), Gordon (a musician in New York), Joseph (a child during the relevant events), and Gina (a teacher). Leland, who had sons Phillip and Jonathan, was a lawyer who worked in New York City in 1982. He eventually moved to Pittsburgh. As noted, Marc had one daughter.

Evelyn was unsophisticated and subject to the control of her father Herman. Joseph assumed management of her affairs after they married. When Joseph died in 1982, Marc, who still lived at home, began to control her assets. When Joseph died, Feldman was contractually obligated to purchase the shares that Evelyn inherited from Joseph, but it was financially unable to do so. Marc continued to operate the stores owned by Feldman, and, after Feldman failed, other businesses. Eventually, Marc started to work at various jobs.

Both Gary and Leland testified that their mother historically treated all three of her sons and her seven grandchildren equally. Gary reported, "[A]t holiday times or anything . . . . [when] she felt like she wanted to make a gift, all the gifts were pretty much similar whether they were to the three brothers or to the grandchildren." N.T. Hearing 5/5/15 (Morning Session), at 60. Leland confirmed, "I think it's fair to say that all three of us had a very

similar relationship to our mother," who "was adamant to go out of her way to make sure that all three of her sons and that all three of her daughters-in-law and that all seven of her grandchildren were always treated equally. That was a big deal to her." N.T. Hearing, 5/26/15, at 1452.

Gary and Leland presented evidence about Evelyn's mental decline, which began in the early 2000s, was marked by 2004, and was severe by 2010. Beginning in the early 2000's, it was noticeable that the parties' mother was having "some memory problems," so the three brothers discussed the situation at that time, and they jointly agreed that a long-term care policy should be purchased. N.T. Hearing, 5/5/15 (Morning Session), at 51. In 2003 or 2004, a long-term care insurance policy was purchased for her from Fortis, which assigned the policy to John Hancock. Gary reported that by 2006, the degradation in Evelyn's mental acuity was such that she was repetitive, called her children by the incorrect names, and "would say things that she had said earlier as if she couldn't remember." N.T. Hearing, 5/5/15 (Morning Session), at 61. Evelyn would also say things and then deny saying them because she did not remember saying them.

In 2007, Evelyn was admitted to the hospital three times and was diagnosed with dementia. On one occasion, she gouged her skin trying to board a bus, was treated in the emergency room at the hospital, and, after arriving home, fainted and hit her head on a stool, rendering her

unconscious. The fall was the result of a mini-stroke, Evelyn was hospitalized, and then entered rehabilitation.[6]

After Evelyn was diagnosed with dementia in 2007, she started to receive caregiver services. John Hancock, which had issued the long-term care policy, covered those services. The policy coverage was triggered only when Evelyn had "cognitive impairment." N.T. Hearing, 5/11/15, at 1155. She briefly took Aricept, which is prescribed to treat dementia resulting from Alzheimer's disease. That medication was discontinued after it proved ineffective. By summer 2010, Evelyn required full-time care.

The brothers had a good relationship with each other until 2008. This relationship soured after Gary and Leland learned that Marc had influenced their mother to alter the disposition of her estate so that the three brothers no longer benefited equally. The events in question started on January 13, 2008, when Leland, Gary, and Marc met at a Panera Bread to discuss their mother's declining mental health, how each son would help her, and the location of her power of attorney and will. Even though Marc knew that Evelyn had executed a will in 2001, a will in 2006, and two wills in 2007,

---

[6] The record indicates that, on September 27, 2007, about one month after Evelyn was released from rehabilitation, Marc took her to a lawyer, Thomas Kessinger. Mr. Kessinger prepared a will stating that any loans that Marc received were not advancements and also indicating that Evelyn had gifted Marc her Feldman stock and the gift was not to be treated as an advancement.

Marc professed to his two brothers that he believed her latest will was the one drafted in 1994. Marc told his brothers that he did not believe that Evelyn had signed the 1994 document. Leland was shocked at this revelation, as the will had undergone many iterations, and Gary and Leland had always thought that the 1994 will, which treated all three sons equally, was executed by Evelyn and that it was the last will that she had signed.

Leland immediately suggested the 1994 will be executed. Marc responded, "Well, how do we know that that's Mom's intent?" N.T. Hearing, 5/26/15, at 1505-06. Leland said to Marc, "Well, why wouldn't it be? It's been her intent for 20 years. What insight do you have that you're alluding to but not explaining?" *Id*. at 1506. When Marc would not answer, Leland began to suspect that Marc was exercising undue influence over Evelyn.

On January 14, 2008, a Sunday, Leland went over to Evelyn's house, as he had been going there every Sunday for about four or five months. He was helping with the bills when he saw an entry in her check register for a check made payable to Kessinger and Klanica. When Leland asked her about it, Evelyn responded, "That's the law firm that Marc and Marjorie took me to." *Id*. at 1507. Evelyn directed Leland to go into her bedroom and get the will.

The document in question was a November 7, 2007 will drafted by Thomas Kessinger. Leland asked his mother "What does the Will say?" *Id*. at 1509. She answered, "I don't know. You tell me. You're the lawyer."

*Id*. The November 7, 2007 will indicated that loans and gifts made to Marc were not to be treated as advancements. Leland told Evelyn that the will was inconsistent with "everything the family had discussed and agreed upon for 25 years. What gave rise to this Will?" *Id*. at 1509. Evelyn said, "Marc and [his wife] Marjie took me to get this Will." *Id*. at 1513.

Leland then described the substance of the will to Evelyn, explaining to her that it provided for an unequal distribution of her assets since it did not treat gifts and loans to Marc as advancements. Evelyn told Leland, "That's not what I want." *Id*. at 1514. Leland asked Evelyn what she did want, and she answered, "I want the way it always was, that we would account for all the moneys that Marc received, and whatever is left would be split three ways." *Id*. Leland informed Evelyn that the will that she signed on November 7, 2007, was inconsistent with that stated intent, she asked what could be done about it, and Leland stated that she had to write a new will.

Leland immediately called Marc, who denied knowing Kessinger or his law firm. Leland then accused Marc of lying, since Evelyn told Leland that Marc took her to the law firm, but Marc continued to insist that he did not know anything about Mr. Kessinger. After January 14, 2007, Evelyn did contact Mr. Kessinger for preparation of a new will as Mr. Kessinger called Leland, and Leland prepared some suggestions for a new will.

The next time that Leland saw Evelyn, she had decided that she no longer wanted to talk about the situation, appearing hostile and agitated

when he broached the subject of a new will.  As Evelyn had never treated Leland with hostility, he was perplexed, "thought something must have happened," and concluded that "it was clear something was bugging her about that."  *Id*. at 1519.  He did not display any animosity toward Evelyn, merely indicating that the family needed to talk about the will.

In February 2008, the three sons, their wives, and Evelyn had a meeting that was intended to resolve the concerns of Gary and Leland about Marc's exercise of undue influence over Evelyn.  At the February 2008 meeting, Marc claimed that Evelyn did not sign the 1994 Grinberg will because "Evelyn couldn't understand legalese."  N.T. Hearing, 5/5/15 (Morning Session), at 21.  As it was apparent that Marc was insisting that his loans and gifts not be treated as advancements and Evelyn remained silent on the subject, that meeting ended in an argument.  Evelyn was upset after that event.

In September 2008, Gary and Leland sued Marc and Marjorie for intentional interference with their expectation of an inheritance, a cause of action that is viable in some states.  That lawsuit was dismissed for failing to state a claim in Pennsylvania, and the dismissal was upheld on appeal.

Gary and Leland were emphatic that, while they were estranged from Marc, they did not involve their mother or their children either in the lawsuit or the dispute over the uneven distribution of their mother's estate outlined

in the November 7, 2007 will. Evelyn was upset about the estrangement among her sons.

Gary talked to Evelyn about the family problem once. He emphatically denied making any demands on her or attempting to force her to sign anything. He merely told Evelyn that she had the power to resolve the controversy and that she should do so. Gary explained to Evelyn that he was aware that she was resisting confronting the issue, as she had resisted all "kinds of difficult situations in your life before," but that the matter about the will was important and that she should resolve it. N.T. Hearing 5/5/15 (Morning Session), 5/5/15, at 41. When Evelyn did not respond, he immediately left and told her that he would see her later.

Gary and Leland testified that they continued to visit and telephone their mother after February 2008, and that their children continued to regularly visit and telephone Evelyn. In 2008, Evelyn attended the bar mitzvah of Leland's son, Jonathan, as well as the luncheon that followed that ceremony.

On Thanksgiving 2008, Gary's sons Gordon and Joseph, and Leland's son Phillip visited Evelyn. Neither Gary nor Leland knew about the visit beforehand. Gordon described the meeting as non-confrontational and as their attempt to resolve the family estrangement. The three grandchildren merely asked Evelyn to resolve the situation by returning to her original estate plan. They never tried to force her to do anything.

- 15 -

After Gary and Leland initiated their litigation against Marc and his wife, Marc Rosenwasser, Esquire, sent Gary and Leland a letter dated December 5, 2008. The letter was prepared after Mr. Rosenwasser met with Marc and Evelyn together, and Mr. Rosenwasser indicated that he did not know whether Marc or Evelyn was the source of the information contained in that document. Gary and Leland testified that the December 5, 2008 letter 1) falsely accused Gary and Leland of displaying hostility toward Evelyn at the February 2008 family meeting; 2) incorrectly indicated that Gary tried to force his mother to change her will; and 3) wrongly characterized the Thanksgiving 2008 visit as initiated by Gary and Leland and as an attempt to coerce Evelyn into equalizing the distribution of her estate.[7]

---

[7] At this juncture, we must point out that the record does **not** support Marc's representation that the information in the December 5, 2008 letter that Mr. Rosenwasser sent to Gary and Leland "came directly from Evelyn Schermer." Appellant's brief at 13. Mr. Rosenwasser said his notes from his file, which he used to compose the letter, were taken during a December 1, 2008 meeting where both Evelyn and Marc were present. He was asked whether Marc "was assisting in providing some of the detail that you apparently set forth on your notes?" N.T. Hearing, 5/11/15, at 1124. He responded, "Jeez, I can't recall." *Id*. He remembered only that Evelyn was upset about the lawsuit that Gary and Leland filed and about "having signed some document that she thought would be – was the wrong thing to do." *Id*. The orphans' court directly asked Mr. Rosenwasser whether he was able to "recall with any degree of precision" if Marc provided information contained in the notes used to compile the December 5, 2008 letter. Mr. Rosenwasser responded, "No, sir." *Id*. at 1125.

We also are aware that Marc introduced into evidence certain handwritten notes from Evelyn. The record does not substantiate that the

*(Footnote Continued Next Page)*

Specifically, no hostility was displayed toward Evelyn at the February 2008 family meeting since Gary and Leland were upset with Marc and not with Evelyn. Gary, aware that his mother was upset about the controversy among the three brothers, merely asked his mother to resolve the family situation. The three grandchildren visited Evelyn on Thanksgiving 2008 because they wanted to stop the dissention among Leland, Gary, and Marc. Gordon, Phillip, and Joseph merely asked Evelyn to try to resolve the unpleasant family situation by providing for an equal distribution of her estate.

During the hearings before the orphans' court, the three caregivers who attended to Evelyn in 2010 testified, as did the scrivener of the June 7, 2010 will, Mr. Rosenwasser. The court specifically credited Mr. Rosenwasser's testimony and found that it established that Evelyn had testamentary capacity on June 7, 2010. On the other hand, the court concluded that Mr. Rosenwasser's testimony had no value on the issue of weakened intellect because Mr. Rosenwasser "only saw the decedent on limited occasions in an office setting, not on a daily basis in her normal environment." Trial Court Opinion, 11/30/15, at (unnumbered page) 6.

---

*(Footnote Continued)*

notes in question were prepared in anyone's presence, and they could have been written by Evelyn while she was under the influence of Marc.

In addition, Gary and Leland presented the testimony of Dr. Robert Bernstein, and Marc's expert witness was Dr. Christine Martone. These expert witnesses gave opposing viewpoints on the question of whether Evelyn suffered from weakened intellect when the probated will was signed. Given the conflicting opinions of the two experts, the orphans' elected to rest its decision as to whether Evelyn had weakened intellect in 2010 upon "the testimony of other unbiased witnesses," who consisted of "three of the Decedent's daily caregivers (Beth Simoni, Prudence Myers, and Jessica Myers) who provided care for [Evelyn] between 2008 and 2011." *Id.* Based upon the testimony of Beth, Prudence, and Jessica, the orphans' court found that Evelyn suffered from weakened intellect in June 2010.

The following testimony was credited by the orphans' court when it concluded that Evelyn had a weakened intellect. Beth Simoni had a Bachelor of Arts degree in psychology and sociology and an Associate's Degree in nursing. From the end of January 2009 until Evelyn's death in August 2011, Beth provided daily care to Evelyn from 2:00 p.m. until 10:00 p.m., except for a maternity leave from the end of November 2010 to March 2011. Thus, Beth was a caregiver for Evelyn in June 2010, when the contested will was signed.

Beth testified as follows. In January 2009, Marc and Evelyn interviewed her, and she was told that Evelyn already "had caregivers because of short-term memory loss. . . . [S]he needed assistance in

remembering to eat, taking her medicines, things like that." N.T. Hearing, 5/7/15, at 524. In March 2009, Beth completed a form for John Hancock and handwrote that Evelyn had both short-term memory difficulties and poor judgment, which she underlined. *Id*. at 533. Beth also indicated on the form that she provided continual supervision for Evelyn due to memory impairment, and she also spoke with a representative of John Hancock on two occasions. On August 18, 2010, Beth informed the representative that Evelyn suffered from, "Cognitive changes with increasing forgetfulness and some confusion." *Id*. at 537.

Beth specified that Evelyn was chronically forgetful. "She would lose her glasses, her credit card, her rings." *Id*. at 527. When Beth and Evelyn would go places, she would forget to place her credit card back in her wallet or leave her rings in the bathroom. One time, Evelyn left a pot on a lit stove burner, and it exploded. To remedy the problem, Marc ordered "Molly's Meals, which is the kosher version of Meals on Wheels," and Marc and Beth encouraged her not to use the stove. *Id*. at 528. Beth also reported that, during Beth's tenure as her caretaker, Evelyn was confused and often repeated herself, telling the "same story or say[ing] the same thing over and over again[.]" *Id*. at 528-530. Evelyn often forgot that she said something shortly after she said it. *Id*. at 531.

Beth substantiated specific instances of confusion displayed by Evelyn. Beth was unable to locate Evelyn a "couple of times" and found her

wandering around on a different floor of the apartment building. *Id*. at 555. At the grocery store, Evelyn would "find something interesting," and would "wander off in the store," and would not have been able to find her way back to her home. *Id*. at 556.

After Evelyn contracted cancer and was dying, she was not even aware of her diagnosis. One day Beth was lifting Evelyn, and Evelyn experienced significant pain. "She said, 'What is wrong with me?'" *Id*. at 544. After Beth told Evelyn that she had cancer, Evelyn asked to speak to Gary and Leland. On another occasion, Evelyn told Beth that she wanted Gary's oldest son to receive money at her death, thus evidencing confusion about the provisions of her will. *Id*. at 545. Beth also substantiated that Evelyn spoke with Gary and Leland and their children on the telephone, and that Gary and Leland's children visited her.

Jessica Myer was a certified nurse's aide who provided companionship and hospice care for sixteen years, had helped about fifty patients, and observed the physical and mental status of her charges. When she began working for Evelyn in the summer of 2010, Evelyn was confused, forgetful, needed help with meals and personal hygiene, and wanted company. *Id*. at 600. Jessica reported that Evelyn remained confused and forgetful the entire time that Jessica worked for Evelyn, progressing in her confusion to the extent that she required twenty-four hour care by fall 2011. *Id*. at 601.

Jessica testified that Evelyn appeared physically or mentally weak frequently. *Id*. at 603. Evelyn displayed deficits in memory, the ability to remember words, and problem solving, and she "didn't have good judgement." *Id*. at 605. As an example of the latter problem, Jessica described an instance where Evelyn had shattered a glass plate by placing it directly on an electric burner rather than using a frying pan. Evelyn also did not have good personal hygiene and had to be directed to shower and keep herself clean. One time, she became covered in chocolate after eating a box of chocolate popsicles.

Jessica established that Evelyn was confused:

Q. Did Evelyn ever appear to you to be disoriented as to time?

A. Yes.

Q. Frequently?

A. Yes.

Q. Did Evelyn ever appear to you to be disoriented as to location?

A. Yes.

Q. Frequently?

A. Yes.

Q. Did Evelyn ever appear to you to not be able to keep her family members straight, one from the other?

A. Sometimes.

*Id*. at 616.

Prudence Myers, Jessica's sister, started to assume caregiver responsibilities for Evelyn while Beth was on maternity leave, beginning in November 2010, and she testified as follows. Marc was present whenever Evelyn signed checks or documents, and, on numerous occasions, Prudence heard Evelyn tell Marc that she did not understand what she was signing. *Id*. at 583. Evelyn would continually re-read the same newspaper or magazine. When Prudence would take Evelyn shopping, she would not be able to remember either the PIN to her debit card or her zip code. *Id*. at 583-84. Prudence reported that Marc monitored who visited Evelyn, and that, after either Leland or Gary visited, Marc would call within five minutes after they left. Prudence stated that Evelyn "was very confused on most occasions." *Id*. at 586.

Marc's first allegation is that the orphans' court erred in "giving decisional weight to the testimony" from Beth, Prudence, and Jessica. Appellant's brief at 27. Secondly, he maintains "it was legal error for the court to subordinate the credible testimony of the drafter of the will[.]" *Id*. at 34. Third, Marc posits that Dr. Bernstein's testimony, which the orphans' court decided not to credit anyway, should not have been admitted, and, concomitantly, was improperly used as grounds for "discounting" and "setting aside" the testimony of his expert witness, Dr. Martone. *Id*. at 38, 48. Finally, even though Gary and Leland presented testimony that Evelyn's reasons for disinheriting them were untrue, Marc maintains that the finding

of the orphans' court that her outlined reasons were false amounted to "capricious disregard of the evidence" and must be reversed. *Id*. at 51.

Gary and Leland note that all four of Marc's allegations challenge credibility determinations rendered by the orphans' court and that this Court is not permitted to disturb such decisions. ***In re Fiedler***, ***supra*** at 1018 ("Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion."). In his reply brief, Marc suggests that none of his positions constitutes a challenge to the credibility determinations of the orphans' court. Appellant's reply brief at 8 ("Appellant does not challenge any of the lower court's credibility determinations," and "the standard of review governing credibility is not material.").

Marc's position is disingenuous. Marc's use of synonyms for "credibility determinations" does not disguise the nature of his claims, and we reject his attempt to avoid the well-established precept that we are not permitted to overrule the credibility determinations of the orphans' court. The following complaints are challenges to credibility determinations of the orphans' court: it erroneously gave "decisional weight" to some witnesses' testimony, improperly "subordinated the credible testimony" of one of his witnesses, should not have "completely set aside" the testimony of his expert witness, and evidenced "capricious disregard of evidence" that he presented.

Simply put, Marc is challenging the orphans' court's decision to: 1) credit the caregivers' testimony; 2) find that Mr. Rosenwasser's testimony was not helpful on the issue of weakened intellect; 3) accord no weight to Dr. Martone's opinion that Evelyn did not have a weakened intellect in June 2010; and 4) accept Gary and Leland's proof that the stated reasons for their disinheritance were false. Each and every one of Marc's positions on appeal constitutes a challenge to the credibility determinations of the orphans' court, and we reject his contention that they are not. While we recognize that Marc wants to avoid the import of a principle of law that effectively forecloses the grant of appellate relief herein, we reject this ploy.

In his first issue on appeal, Marc suggests that the caregivers' testimony should have been discounted. Marc maintains, "In any case where 'weakened intellect' is at issue, it is well settled the question is to be determined by the decedent's mental condition **at the point in time when he or she actually executed the Will**." Appellant's brief at 27 (emphasis added). With this legal proposition as the foundation of his argument, Marc continues that the three caregivers did not establish weakened intellect because 1) they "were indefinite regarding when the instances of forgetfulness and confusion occurred relative to **the actual signing of the probated Will**," Appellant's brief at 5 (emphasis added); 2) they failed to establish that Evelyn's forgetfulness and confusion occurred "**at or before the time of the execution of the probated Will**," *Id*. at 27 (emphasis in

original); and their testimony failed to establish that Evelyn "suffered from 'weakened intellect' at the time she made the probated Will." *Id*.

Marc's legal premise is incorrect and his ensuing argument fails due to its reliance on this faulty foundation. "[T]estamentary capacity is to be ascertained as of the date of execution of the contested document," not undue influence. *Smaling*, *supra* at 494. In this case, the orphans' court credited testimony proffered by the scrivener of the will, Mr. Rosenwasser, and concluded that Evelyn had testamentary capacity on June 7, 2010. However, testamentary capacity is a very low mental threshold. "Testamentary capacity exists when the testator has intelligent knowledge of the natural objects of his bounty, the general composition of his estate, and what he or she wants done with it, even if his memory is impaired by age or disease." *Id*.

The law is clear that, "The weakened intellect necessary to establish undue influence need **not** amount to testamentary incapacity." *Smaling*, *supra* at 498 (emphasis added). Instead, weakened intellect is present if the testator consistently displayed confusion, forgetfulness, and disorientation. *Id*. Notably, for purposes of weakened intellect, "the particular mental condition of the testator on the date he executed the will is **not as significant** when reflecting upon undue influence as it is when reflecting upon testamentary capacity. **More credence may be given to remote mental history**." *Id*. (emphases added). Thus, a person with

testamentary capacity can nevertheless have been subject to undue influence sufficient to invalidate a will. *Id*. Simply put, Marc is incorrect in his assertion that weakened intellect is determined solely by reference to the date the will is signed and that the caregivers' testimony was infirm because it encompassed the time frame before and after the will's execution.

In connection with the first issue in his brief, Marc heavily relies upon our decision in *In re Estate of Angle*, 777 A.2d 114 (Pa.Super. 2001), where we upheld a finding by the orphans' court that the testator had testamentary capacity and was not subject to undue influence when he executed his will. Our ruling in *Angle* on the question of testamentary capacity is not relevant herein since the orphans' court specifically found that Evelyn did have such capacity. Moreover, in *Angle*, the orphans' court rejected the undue-influence challenge to the will based upon the fact that there was no confidential relationship. Specifically, the orphans' court determined that the testator was not "dominated or manipulated by anyone[.]" *Id*. at 123. Thus, the *Angle* decision rested upon a finding that there was no confidential relationship whereas Marc has not challenged the finding by this orphans' court that he was in a confidential relationship with his mother. Thus, Marc's reliance upon *Angle* is wholly misguided.

Our decision in *Owens v. Mazzei*, 847 A.2d 700 (Pa.Super. 2004), dispels the validity of Marc's first position on appeal. Therein, the orphans' court held that two bank employees and their employer were jointly and

severally liable to the decedent's estate for assets contained in a bank account. The estate averred that the employees had, while operating within the scope and course of their duties for the bank, exercised undue influence over the decedent and induced the decedent to name them as the sole beneficiaries of a bank account that contained the bulk of the decedent's assets. Therein, the employees and the bank specifically challenged the finding by the orphans' court that the decedent had weakened intellect when he created the bank account. In rejecting that argument, we specifically considered behavior displayed by the decedent both before and after the account in question was opened.

In the present case, the three caregivers' testimony established that Evelyn regularly displayed confusion, disorientation, forgetfulness, and poor judgment both before and after June 7, 2010. Beth was clear that this mental state existed when she first started working for Evelyn in 2009. Jessica began to care for Evelyn during the summer of 2010, coextensive temporally with when Evelyn executed the contested will. Jessica indicated that Evelyn was persistently disoriented, confused, forgetful, and reliant on her caregivers and Marc. Jessica also confirmed that Evelyn had memory, language, and problem solving deficits. Evelyn's mental condition progressively deteriorated.

Indeed, Evelyn's mental decline began in the early 2000s, years before this will was executed. Her mental state prompted the purchase of long-

term care insurance, which Marc himself agreed was prudent to obtain. Coverage under the policy was triggered only if Evelyn suffered from cognitive impairment, and coverage under that policy commenced in 2007, three years before the will in question was signed. Thus, we reject Marc's position that the orphans' court improperly accorded "decisional weight" to the testimony of the three caregivers.

Marc's second position is that the orphans' court improperly afforded limited or no evidentiary weight to the credible testimony of Mr. Rosenwasser, who drafted the will. After careful review, we conclude that Mr. Rosenwasser proffered no testimony at all as to the existence of weakened intellect. Between June 2008 and June 2010, Mr. Rosenwasser had four or five meetings with Evelyn lasting approximately one hour. He had little specific recollection of what occurred during those meetings. N.T. Hearing, 5/11/15, at 1083 (regarding the June 4, 2008 meeting, he did not remember if Evelyn was alone and based his memory of the event on the contents of a standard form that he completed); *Id*. at 1087 (regarding a June 18, 2008 meeting, Mr. Rosenwasser had "no recollection other than I know there was a meeting"); *Id*. at 1096 (unable to remember if file notes were based upon information given to him by Evelyn); *Id*. at 1122-25 (failed to remember details about a December 1, 2008 meeting involving Marc and Evelyn that resulted in the letter to Gary and Leland); *Id*. at 1124, 1125 (responded he "can't recall" when asked whether Marc or Evelyn was the

source of his file notes about the events detailed in his December 5, 2008 letter); *Id*. at 1177 (Mr. Rosenwasser had "no specific recollection" about having a conversation with Evelyn about why she altered disposition of her residuary estate and decided to disinherit Gary and Leland in her final will."). Suffice it to say, Mr. Rosenwasser's testimony was replete with instances where he could not remember events concerning his interactions with Evelyn.

Mr. Rosenwasser reported that Evelyn appeared lucid and did not display short-term memory loss during their conferences, but qualified his testimony by stating that their interactions totaled "four or five hours not in a block, but over a period of time." *Id*. at 1107. Mr. Rosenwasser did not know Evelyn's age, as he never asked that as part of his biographical information when interviewing clients. *Id*. at 1069-70. Mr. Rosenwasser specifically reported that he did not employ "any practices" to establish whether or not a client had "weakened intellect," and he admitted that he was sure that one of his clients "could have some mental issues that aren't apparent [during] a short meeting." *Id*. at 1073-74, 1107. Most significantly, Mr. Rosenwasser acknowledged he "didn't do anything" to determine whether Evelyn was subject to undue influence at the time of the June 2010 will, and he stated that, instead, his "**sole concern** was whether Evelyn had mental capacity to execute a will." *Id*. at 1189, 1183 (emphasis added).

Mr. Rosenwasser's testimony did establish that Evelyn had testamentary capacity, and the orphans' court credited his testimony in that respect. Mr. Rosenwasser, however, candidly admitted that he did not try to ascertain whether she suffered from weakened intellect or whether she was being unduly influenced. The question of testamentary capacity was his only concern. After careful review, we cannot find that the orphans' court abused its discretion in concluding that Mr. Rosenwasser's testimony was unhelpful on the subject of whether Evelyn suffered from a weakened intellect on June 7, 2010.

Marc's third position is that Dr. Bernstein's testimony was improperly considered, and, thus, should not have been used to set aside Dr. Martone's contrary opinion. Appellant's brief at 48-50. Initially we note: "It is beyond argument that the fact-finder is free to accept or reject the credibility of both expert and lay witnesses, and to believe all, part or none of the evidence." **Brown v. Trinidad**, 111 A.3d 765, 771–72 (Pa.Super. 2015) (citation omitted). In the present case, the orphans' court found both expert witnesses credible and, since they proffered opposing opinions, elected to rely upon the testimony of the three caregivers. Marc's specific contention is that Dr. Bernstein's opinion was infirm and, concomitantly, should not have been used to nullify the testimony of Dr. Martone.

Marc maintains that Dr. Bernstein's testimony should not have been relied upon for two reasons: 1) Dr. Bernstein supposedly testified that he did

not understand the legal concept of weakened intellect, Appellant's brief at 398-41; and 2) Dr. Bernstein "never testified that he was of the opinion, to a reasonable degree of medical certainty that [Evelyn] **in fact** suffered from 'weakened intellect' at the time she executed the probated Will[.]" Appellant's brief at 43 (emphasis in original).

Marc's positions are a gross mischaracterization of the record. Dr. Robert W. Bernstein, Chief of Medicine at UPMC Magee, was board-certified in internal medicine, had practiced in that field for thirty-five years, and, for those thirty-five years, fifty percent of his practice involved geriatric patients. Dr. Bernstein reviewed Evelyn's medical documentation to "determine if there was any evidence in her medical records that would suggest weakened intellect." N.T. Hearing, 5/8/15, at 889. Dr. Bernstein reviewed case law given to him by Leland so that he could understand "what the term weakened intellect means under the laws of the Commonwealth of Pennsylvania." *Id*. Dr. Bernstein, after reviewing the cases, opined, "It was my opinion, based upon the medical evidence, even before 2010, there was evidence of **significant weakened intellect**." *Id*. at 891 (emphasis added). On cross-examination, Dr. Bernstein confirmed, "I understand weakened intellect." *Id*. at 904.

Dr. Bernstein based his opinion that Evelyn had weakened intellect before 2010 on various medical records, but he found it significant that there was a "mental status exam performed, I believe, in 2007 that showed **more**

**than just weakened intellect** but suggesting that possibly dementia was an issue as well." *Id*. at 892 (emphasis added). Dr. Bernstein concluded that this mental condition stemmed from "the effects of vascular disease, which is a function of aging, diabetes mellitus, high blood pressure, all things that were in evidence in her medical care." *Id*. at 892. Also contributing to Dr. Bernstein's opinion that Evelyn suffered from weakened intellect before 2010 was her history of transient ischemic attacks (mini-strokes) and "multiple falls leading to head trauma." *Id*. at 895.[8] At the end of his testimony, Dr. Bernstein reported that all of "the opinions that [he had] provided here today," were based upon his review of the medical records and were offered "to a reasonable degree of medical certainty." *Id*. at 901.

Thus, the record categorically refutes Marc's suggestion that Dr. Bernstein stated that he did not understand the legal definition of weakened intellect. Dr. Bernstein merely indicated that he did not understand portions of the cases that he read and that he did not review those sections of the cases that did not pertain to the issue before him. *Id*. at 920-21. Likewise, Dr. Bernstein opined that Evelyn suffered from a weakened intellect prior to 2010 and rendered that opinion to a reasonable degree of medical certainty.

---

[8] While Marc suggests that Dr. Bernstein's testimony rested on protocols that pertained to obtaining a patient's informed consent, Dr. Bernstein's clearly articulated that these opinions were based upon his review of her medical records. He thereafter discussed the informed consent protocols. *See N.T.* Hearing, 5/8/15, at 900, *et seq.*

Thus, Marc misrepresents the record when arguing that Dr. Bernstein articulated that he did not understand the legal definition of weakened intellect and never opined that Evelyn suffered from that condition to a reasonable degree of medical certainty. We reject the third issue raised on appeal.

Marc's fourth and final contention is that the orphans' court capriciously disregarded substantial and direct evidence that the reasons that Evelyn disinherited Leland and Marc were true. Appellant's brief at 51. Marc claims that Evelyn "executed the probated Will in reaction to the machinations of Gary and Leland Schermer and their children, trying to **force** the Decedent to change an earlier will." *Id*. (emphasis added). Gary and Leland were adamant that they never tried to coerce Evelyn in any manner. They knew that she was upset about the family dissension and told her that she could resolve it by returning to her original estate plan. As the testimony of Gary, Leland, and Gordon established the absence of an attempt to force or coerce Evelyn into changing her will, the orphans' court was permitted to credit that proof, and reject Marc's position in that respect. We also note that Marc's final contention is actually unrelated to the issue on appeal, which is whether Evelyn suffered from a weakened intellect.

Gary and Leland offer an astute observation. The supposed events that led to their disinheritance occurred in late 2008. Specifically, the June 7, 2010 document expressed that Gary and Leland were not beneficiaries

because they sued Marc, alienated her from her grandchildren, used the grandchildren to influence her to change her will, and did not respect her desires as to disposition of her estate. This state of affairs was true as of December 2008. Meanwhile, Evelyn executed a will in 2009 that still left her residuary estate, in equal shares, to all three of her sons. The events that supposedly motivated Evelyn to leave all of her estate to Marc were in existence in 2009, when she did not disown Gary and Leland. These facts constitute a further reason to discount the reasons outlined in the 2010 will for the disinheritance of Gary and Leland.

During this final argument, Marc also observes that, in the 2001 will, which was executed before Evelyn suffered from weakened intellect, she forgave $140,000 in loans to him. He maintains that the 2001 testamentary disposition constituted proof that "powerfully rebuts any inference the 2010 Will was the product of undue influence[.]" *Id*. at 52. Marc relies upon this precept: "It is well settled in Pennsylvania that a prior will containing the same testamentary disposition is strong evidence against undue influence." ***Burns v. Kabboul***, 595 A.2d 1153, 1162 (Pa.Super. 1991).

The principle of law in question is inapplicable herein. The 2001 will left Marc one-third rather than one hundred percent of Evelyn's estate. The 2001 will also forgave Marc's $140,000 debt. After 2001, there were gifts that Evelyn made, including a post-2001 gift of her Feldman stock, to Marc and his family. In the June 7, 2010 will, all these gifts, in addition to loans,

- 34 -

were not treated as advancements. It is an utter fallacy to characterize the 2001 will as the same testamentary disposition as the 2010 will.

In accordance with the forgoing, this Court concludes that we cannot overturn the credibility determinations of the orphans' court, and that the evidence credited by that court supports its conclusion that Evelyn suffered from a weakened intellect on June 7, 2010.

Order affirmed.


Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/2/2017