J. A12043/18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ESTATE OF LOUIS G. HILL, DECEASED | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF:  CRAWFORD HILL, | : | |
| LESLIE HILL, THOMAS HILL AND | : | No. 2342 EDA 2017 |
| MICHAEL HILL | : | |

Appeal from the Order Entered June 16, 2017,
in the Court of Common Pleas of Montgomery County
Orphans' Court Division at No. 2013-X3016

BEFORE:  BOWES, J., NICHOLS, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED OCTOBER 10, 2018**

Crawford Hill, Leslie Hill, Michael Hill, and Thomas Hill (collectively, appellants) appeal the June 16, 2017 order of the Court of Common Pleas of Montgomery County, Orphans' Court Division ("orphans' court"), that denied appellants' petition to invalidate the transfer of assets from Louis Hill's (Decedent) account with Raymond James Associates ("Raymond James") into a joint account in the names of Decedent and Marilyn A. Hill ("Mrs. Hill"), the wife of Decedent.  After careful review, we affirm.

Decedent was originally married to Jane Cox ("Cox"), a member of the Bancroft family that owned a substantial interest in the Dow Jones Company ("Dow Jones") that previously owned the *Wall Street Journal*.  Decedent had seven children[1] with Cox.  After divorcing Cox, Decedent married Mrs. Hill.

---

[1] Appellants are four of the seven children.

Decedent died on July 13, 2013. Mrs. Hill and appellants were named as co-executors of Decedent's estate based on a will dated April 1, 2004.

On July 2, 2014, appellants filed a petition for citation to show cause why the purported transfer of substantially all the contents of the Raymond James account from an account in Decedent's name alone to a joint account in the name of Decedent and Mrs. Hill should not be declared invalid. Appellants alleged that Decedent lacked capacity to make the transfer that he purportedly authorized on June 27, 2007, due to advanced dementia. In the alternative, appellants alleged that the purported transfer was the product of undue influence exercised by Mrs. Hill who, appellants claimed, was so convinced that Decedent's children did not have any need to inherit any money from Decedent and of her relative need to inherit money from Decedent that she prevailed upon Decedent to change his long-established estate plan. ("Petition for Citation to Show Cause Why Purported Transfer of Substantially All the Contents of a Brokerage Account Owned by Decedent to a Newly Opened Account Owned Jointly with his Spouse Should Not be Declared Invalid," 7/2/14 ("Petition") at 8, ¶¶ 41-42.)

Appellants further alleged in the petition:

> 31. On June 26, [2007,] on the afternoon of the day on which [Mrs. Hill] had taken [Decedent] to the Chestnut Hill emergency room for treatment of anxiety and agitation, after returning home from the hospital [Decedent] apparently contacted Ralph McDevitt, a broker at [Raymond James], who had long served as his broker.

32. [Decedent] purportedly told Mr. McDevitt that he wanted to transfer substantially all of the assets in his individually owned brokerage account at Raymond James to a newly opened account owned jointly with [Mrs. Hill]. The individually owned account held the lion's share of [Decedent's] most liquid assets, worth approximately $4,779,000 at that time.

33. [Decedent] had never purported to express any such wish before June 27, 2007. To the contrary, prior to June 2007, when Mr. McDevitt had unilaterally raised with [Decedent] the topic of whether he wished to transfer assets owned by him to joint ownership with [Mrs. Hill], [Decedent] told Mr. McDevitt affirmatively that he did not want to do so. He told McDevitt on another occasion that he "had his reasons" for not putting assets in joint names.

34. Those statements to Mr. McDevitt were consistent with [Decedent's] statements made over many years to his children that he had made specific provision for [Mrs. Hill] in his Will, but that the bulk of his financial assets would pass to them on his death.

35. [Decedent's] probated Last Will and Testament is consistent with these often expressed wishes. The Will, whose terms he discussed with his children, provides for a substantial bequest to [Mrs. Hill], including financial assets, personalty and real estate, with the remainder divided among his issue. Pursuant to those terms, had the assets not been transferred to joint ownership with [Mrs. Hill], most of them would pass to his children, a result changed by the purported transfer made on June 27, 2007.

36. Moreover, the purported transfer also had another deleterious effect on his long established estate plan. By removing the contents of the transferred account from his estate, the transfer depleted his estate of

> sufficient financial assets to pay all of its obligations, including taxes, thereby requiring abatement of many of the carefully planned bequests in his Will.

Petition at 6-7, ¶¶ 31-36.

On August 5, 2014, Mrs. Hill answered and denied the material allegations of the petition. As new matter, she asserted that appellants' claim was barred by laches. Appellants denied that the claim was barred.

The orphans' court heard the matter on June 20-22, 2016. Thomas Hill ("T. Hill"), one of the appellants, testified that he first became aware of his father's dementia in approximately 2002 when Decedent and Mrs. Hill lived at a house on St. George's Road in the Chestnut Hill section of Philadelphia. (Notes of testimony, 6/20/16 at 38.) T. Hill testified that Decedent and Mrs. Hill moved to a house on Germantown Avenue in 2003 that was directly across the street from Chestnut Hill Hospital. (*Id.* at 41.) Around that time, T. Hill began to notice Decedent repeating questions and conversations. In addition, Decedent who had been an avid runner and walker stopped taking walks in the neighborhood because he was afraid of getting lost. (*Id.* at 42.) T. Hill testified that in December 2005, Decedent did not recognize him. (*Id.* at 47.) T. Hill reported that Decedent, in various conversations over the years, stressed that it was important to him to pass on the wealth he inherited to his children. (*Id.* at 55.) T. Hill did not learn of the June 27, 2007 transaction until after Decedent's death. However, shortly before Decedent's death, Mrs. Hill told T. Hill that some accounts of hers and of Decedent's had been

consolidated for convenience purposes. (*Id.* at 57.) T. Hill reported that some specific bequests in Decedent's will had not been paid because there were insufficient assets to do so. (*Id.* at 58.)

On cross-examination, T. Hill admitted that he only saw Decedent once or twice a year from 2005-2007. (*Id.* at 70.) On redirect, T. Hill testified that when he visited Decedent at Jefferson Hospital in the summer of 2007, Decedent was in a locked ward and could do no more than exchange pleasantries and ask to leave the hospital. (*Id.* at 83.)

Leslie Hill ("L. Hill"), another one of the appellants and a co-executor of Decedent's estate, testified that she was a member of the board of directors of Dow Jones from 1997-2007 and that the Bancroft family decided to sell the company in mid-July of 2007. (*Id.* at 96, 98.) L. Hill corroborated some of her brother's testimony. She also testified that Decedent repeatedly said that he had no money and told her in 2006 that he had no children. (*Id.* at 104.) L. Hill testified that at a funeral, Decedent did not realize that he was no longer married to Cox. (*Id.* at 108.)

Michael Hill ("M. Hill"), another appellant and a co-executor of Decedent's estate, testified that he first believed Decedent exhibited signs of dementia such as forgetting names and repeating stories in the late 1990's or 2000. At a dinner shortly after Decedent's birthday in March 2007, Decedent did not believe that he had seven children and ten grandchildren and did not know their names. (*Id.* at 159.) M. Hill reported that Decedent told him

during telephone conversations that Mrs. Hill was trying "to take everything from me." (**Id.** at 162.) On cross-examination, M. Hill admitted that Decedent did not make those claims after 2003. (**Id.** at 181.)

Jessie B. Hill ("J.B. Hill"), a daughter of Decedent, testified that before she moved to Hawaii in July 2006, she saw Decedent at least weekly. She first noticed signs of dementia in Decedent in 1998 when he stopped working. (Notes of testimony, 6/21/26 at 207.)

Charlotte Hill, another child of Decedent, testified that she would see Decedent two or three times a year between 2000 and 2007. (**Id.** at 227.) She first noticed a decline in Decedent in 1998 when he visited her in California and forgot their plan to spend the day together. (**Id.** at 228-229.)

Crawford Hill, III ("C. Hill"), another child of Decedent and an appellant, testified that Decedent was unable to give him advice about a legal matter in 2005. (**Id.** at 244-245.) C. Hill testified that when he visited Decedent at Chestnut Hill Hospital in 2007, Decedent was attempting to undo restraints and did not know who his children were. (**Id.** at 255-258.)

Barry Rovner, M.D. ("Dr. Rovner"), a board-certified psychologist, testified on behalf of appellants as an expert witness. Dr. Rovner reviewed medical records and depositions from family members and other witnesses. Dr. Rovner concluded that Decedent suffered from Alzheimer's disease. (**Id.** at 315.) When asked whether Decedent was capable of calling a stockbroker on June 26, 2007, to explain that he wanted to change the ownership of his

broker account without evidence of cognitive impairment, Dr. Rovner opined,

"all the evidence would say no." (*Id.* at 378.)  He also believed that Decedent

would have been susceptible to influence from another person.  (*Id.* at 380.)

Edwin R. McDevitt ("McDevitt"), senior vice president of investments for

Raymond James, testified on behalf of Mrs. Hill.  He testified that Decedent

had been a client of his since the early 1990's.  (Notes of testimony, 6/22/16

at 455.)  McDevitt testified that he did not remember Decedent ever discussing

the Bancroft family's holdings in Dow Jones prior to meeting with him on

June 27, 2007, to change his account to a joint account with Mrs. Hill except

for the Dow Jones stock.  (*Id.* at 466.)  McDevitt also testified that he met

with Decedent alone at Decedent's house on June 27, 2007.  He explained the

substance of the meeting:

> [W]e talked about the Dow Jones merger.  I think I was surprised that it was actually going to take place. I told him that.  That's when he shared with me that it was an important event for his family and for his kids.
>
> And then he shared with me that he wanted to change his single-name account to a joint account.  I asked him why.  He told me his reasoning for that. . . .
>
> . . . .
>
> To the best of my recollection, he said, "This is a very big event for my kids.  This will give them a lot of money, more money than they will ever need, a multiple of what I own.  And then he said, I need to take care of [Mrs. Hill] now."

*Id.* at 477-478.

McDevitt did not notice anything unusual about Decedent's mental state and had a normal conversation with him. (*Id.* at 479.) McDevitt never noticed Decedent having any cognitive problems until he moved to The Hill at Whitemarsh in 2008. (*Id.* at 490.)

With respect to the June 27, 2007 meeting with McDevitt, Mrs. Hill testified that Decedent did not tell her why McDevitt was coming to their house. (*Id.* at 583.)[2]

On June 15, 2017, the orphans' court denied appellants' petition. The orphans' court concluded that appellants failed to establish that Decedent lacked capacity or acted under undue influence when he changed his Raymond James account from an individual account to a joint account with Mrs. Hill. Regarding the question of whether Decedent possessed sufficient capacity to make the transaction, the trial court reasoned:

> [A]fter considering all the evidence, included that presented ***contra*** [appellants], the weaknesses in their contest surfaced. For example, all but one of the children who testified as to their father's decline had very limited actual contact with him at or around the crucial time period. Crawford, the only child who lived locally and saw [Decedent] on a regular basis, testified to some incidents of confusion and

---

[2] Margaret Yanni, who provided housecleaning services for Decedent and Mrs. Hill, testified regarding her interactions with Decedent. Barbara Houldin, a retired attorney and a neighbor of Decedent and Mrs. Hill, testified that she did not see any evidence of cognitive impairment in her dealings with him when they were neighbors. (*Id.* at 689-691.) Everett Kenyatta, a personal trainer for Decedent commencing in March 2007, testified that he never had difficulty communicating with Decedent though Decedent did have trouble remembering the sequence in which exercises were to be completed. (*Id.* at 720.)

> disorientation which would not alone support a finding of lack of capacity as of June of 2007. [Appellants'] medical expert had no contact with [Decedent]. As for the value of his opinion, case law is replete with the admonition that testimony from experts who testify only from medical records and witness depositions is entitled to little weight.

Orphans' court opinion, 6/15/17 at 28 (citations omitted).

> Contrary to most of [appellants'] witnesses, Mrs. Hill's witnesses had regular contact with [Decedent] on or around June 27, 2007. Ms. Yanni, the Hills' housekeeper, saw him every week, and testified credibly that she observed no unusual behavior at the time in question. Mr. Kenyatta, the person [sic] trainer, saw him twice a week. He noticed some memory issues, but stated he was able to have normal conversations with [Decedent] and detected no confusion or disorientation in his client. Most persuasive was the testimony of [McDevitt] who testified, without hesitation, that [Decedent] articulated clearly why he was making the change in the title to the account and understood what this would accomplish. The fact that [Decedent] instructed his broker not to transfer his Dow Jones holdings was especially telling. The testimony of these three disinterested witnesses was compelling and leads us to conclude, without hesitation, that [Decedent] had the requisite capacity to direct the transfer of his assets to a joint account on June 27, 2007.

*Id.* at 30.

Regarding the issue of undue influence, the orphans' court determined that this claim failed because Mrs. Hill was not in a confidential relationship with Decedent, and Decedent did not have a weakened intellect at the time of transfer. (*Id.* at 31-32.)

On July 10, 2017, appellants moved for reconsideration. [3]  On July 14, 2017, appellants filed a notice of appeal.  On August 3, 2017, the orphans' court directed appellants to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b).  Appellants complied with the order on August 24, 2017.  On October 10, 2017, the orphans' court filed a supplemental opinion pursuant to Pa.R.A.P. 1925(a).

Appellants raise the following issues for this court's review:

1.     Did the [o]rphans' [c]ourt abuse its discretion in finding that [Decedent] lacked the capacity to make the contested gift where [Mrs. Hill's] own testimony and contemporaneous reports to his treating physicians showed he lacked awareness of his wealth and what he wished done with it?

2.     Did the [o]rphans' [c]ourt err as a matter of law by failing to place the burden of proof and risk of non-persuasion upon Mrs. Hill, the proponent of a testamentary gift effective on the death of the donor, to prove the absence of undue influence in the making of that gift, as required under the controlling Pennsylvania Supreme Court authority of *In re Estate of Clark*[, 334 A.2d 628 (Pa. 1975),] and *Estate of Reichel*[, 400 A.2d 1268 (Pa. 1979)], where facts establishing a weakened intellect, confidential relationship and a substantial benefit were found by the [o]rphans' [c]ourt, but still declined to do so for reasons not permitted under *Clark* and *Reichel*?

---

[3] The Orphans' Court did not rule on the motion.  Under Orphans' Court Rule 8.2 and the explanatory comment, a motion for reconsideration is not required from a final order and does not toll the period for filing an appeal unless the Orphans' Court grants the motion for reconsideration prior to the expiration of the appeal period.

Appellant's brief at 2.

This court's review of a decree entered by the orphans' court is limited to a determination of whether the record is free from legal error and whether the evidence supports the factual findings of the orphans' court. Because the orphans' court serves as the fact-finder, it determines the credibility of witnesses. This court will not reverse credibility determinations absent an abuse of discretion. ***In re Estate of Harrison***, 745 A.2d 676, 678 (Pa.Super. 2000).

Initially, appellants contend that Decedent lacked capacity to make the transfer of the Raymond James account.[4]

> Testamentary capacity exists when the testator has intelligent knowledge of the natural objects of his bounty, the general composition of his estate, and what he or she wants done with it, even if his memory is impaired by age or disease. "Neither old age, nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property." In determining testamentary capacity, a greater degree of proof of mental incapacity is required than would be necessary to show the inability to conduct one's business affairs. Finally, testamentary capacity is to be ascertained as of the date of execution of the contested document.

---

[4] The gift did not take effect until the death of Decedent as Decedent made the gift as a transfer from an account in his own name to an account he held jointly with Mrs. Hill with a right of survivorship. The parties and the orphans' court treated this transfer as a testamentary gift with its validity subject to the law determining the validity of wills. That is consistent with this court's prior holdings. ***See In re Sachetti***, 128 A.3d 273 (Pa.Super. 2015).

- 11 -

*In re Estate of Smaling*, 80 A.3d 485, 494 (Pa.Super. 2013) (*en banc*) (citations omitted).

Under Pennsylvania law, testamentary capacity is presumed to exist until it is established that it does not. *In re Estate of Brantlinger*, 210 A.2d 246, 249 n.11 (Pa. 1965). Further, in general, a person may leave his or her property to whomever he or she wishes. *In re Estate of Angle*, 777 A.2d 114, 125 (Pa.Super. 2001). A party seeking to prove that a testator lacked testamentary capacity must overcome the presumption of testamentary capacity through strong, clear, and compelling evidence. *In re Masciantonio's Estate*, 141 A.2d 362, 370 (Pa. 1958).

Appellants assert that the orphans' court abused its discretion when it determined that Decedent possessed the capacity to make the contested transfer from his individual account into a joint account with Mrs. Hill. Appellants assert that at approximately the same time as the transfer, Decedent suffered from serious dementia and was anxious due to a deluded belief that he had no money and that these conditions were documented in contemporaneous medical records that were based on reports from Mrs. Hill. Appellants concede that none of them or their witnesses witnessed Decedent's June 2007 behavior first hand. (Appellant's brief at 24). However, Mrs. Hill did witness this behavior and reported it at the time. In addition, appellants claim that nothing in McDevitt's testimony demonstrated that Decedent did not have these problems. (*Id.*).

In its supplemental Rule 1925(a) opinion, the orphans' court opined that it found McDevitt credible. The orphans' court explained its determination: "Mr. McDevitt provided direct evidence of the decedent's capacity to make financial decisions on that date. On the basis of this testimony, this Court determined that the appellants had not borne their burden of proving that the decedent lacked testamentary capacity on June 27, 2007." (Supplemental orphans' court opinion, 10/10/17 at 3.)

Once again, McDevitt testified that Decedent explained to him that his children were going to reap a financial windfall due to the sale of Dow Jones. Decedent explained to McDevitt that as a result of the Dow Jones sale, he did not have to provide for his children to the same extent and that he had a desire to "take care of [Mrs. Hill]." (Notes of testimony, 6/22/16 at 477-478.) In evaluating evidence in the area of testamentary capacity, "the testimony of those who observed the speech and conduct of the person on the day of execution of the instrument whose validity is challenged . . . . outranks testimony as to observations prior to and subsequent to that date, although the latter testimony is admissible and entitled to weight." *In re Meyers Estate*, 189 A.2d 852, 862 (Pa. 1963).

Appellants also argue that Mrs. Hill reported Decedent's unusual behavior on the day that he called McDevitt to set up the meeting where the transfer occurred. A review of the record indicates that Decedent was taken to the hospital on June 26, 2007, for agitation and/or confusion. Appellants

assert that Mrs. Hill, who was otherwise found credible, testified in support of Decedent's confusion prior to the transfer and that the orphans' court abused its discretion when it ignored this evidence. However, the orphans' court explained that it found the testimony of McDevitt credible and compelling. The orphans' court did not either abuse its discretion or commit legal error when it found that Decedent possessed the capacity to make the transfer.

Appellants next contend that Decedent made the transfer due to the undue influence of Mrs. Hill.

The party raising the issue of undue influence in a will, or here the transfer of funds in the Raymond James account from Decedent's name into joint names of Decedent and Mrs. Hill, bears the burden of proving that the transfer was procured by undue influence. *In re Estate of Stout*, 745 A.2d 645 (Pa.Super. 2000). Once, a party establishes a *prima facie* case of undue influence, the burden shifts to the proponent of the will or transfer to prove that the will was not obtained by undue influence. *Angle*, 777 A.2d at 123.

In order to establish a *prima facie* case of undue influence, a party must establish 1) that a confidential relationship existed between the testator and the proponent; 2) that the proponent received a substantial benefit; and 3) the testator possessed a weakened intellect. For the purposes of this test, weakened intellect does not rise to the level of testamentary incapacity. *Id.*

The parties do not dispute that Mrs. Hill received a substantial benefit from the transaction. With respect to the weakened intellect requirement,

appellants assert that they established that Decedent suffered from a weakened intellect due to his dementia.

> Although our cases have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation. The Orphans' Court's mandate in assessing such evidence is relatively broad. If the court's decision rests upon legally competent and sufficient evidence, we will not revisit its conclusions. Under no circumstance will we substitute our judgment of credibility for that of the Orphans' Court.

***Owens v. Mazzei***, 847 A.2d 700, 707 (Pa.Super. 2004) (citations omitted).

The orphans' court concluded that apart from an undisputed diagnosis of dementia, the record was largely devoid of facts upon which a finding of weakened intellect is usually based. (Orphans' court opinion, 6/15/17 at 32.) Similarly, in the supplemental Rule 1925(a) opinion, the orphans' court stated that despite some evidence of cognitive decline, appellants failed to carry their burden of proving that Decedent suffered from a weakened intellect.

Appellants believe that the trial court applied the wrong burden of proof. It is appellants' burden to prove that a confidential relationship existed between Decedent and Mrs. Hill, that Decedent had a weakened intellect, and that Mrs. Hill benefited from the transaction. While there is no dispute that Mrs. Hill benefited from the transaction, the orphans' court found that appellants failed to prove the existence of either a weakened intellect or a confidential relationship. There is no indication that the orphans' court applied

- 15 -

the incorrect burden of proof. In order for the burden of proof to shift to Mrs. Hill, appellants must have established those three elements. The orphans' court determined that appellants did not meet this burden, so the burden did not shift to Mrs. Hill.

Alternatively, appellants argue that the orphans' court erred when it determined that Decedent did not suffer from a weakened intellect when there was testimony concerning Decedent's dementia that manifested itself in confusion and disorientation.

However, even though Decedent clearly suffered from dementia, that in and of itself does not constitute a weakened intellect. In **Angle**, the contestants alleged that the will of Amos A. Angle, the testator, was procured by undue influence. This court explained weakened intellect in the context of undue influence:

> There is no doubt that Mr. Angle suffered from Alzheimer's disease; however, the existence of that disease, in itself, does not establish incompetency to execute a legal document. Since there are periods of lucidity with the disease, the relevant inquiry is whether at the time of the execution of the document, the decedent was lucid and competent. A doctor's opinion on medical incompetence is not given particular weight especially when other disinterested witnesses establish that a person with Alzheimer's disease was competent and not suffering from a weakened intellect at the relevant time.

**Angle**, 777 A.2d at 123.

Here, the orphans' court determined that appellants failed to establish any evidence that Decedent suffered from a weakened intellect at the time of

the transfer, other than the undisputed diagnosis of dementia. However, McDevitt testified that at the time of the transfer, Decedent did not exhibit any signs of dementia and clearly indicated his desire to transfer the account and explained his reason for doing so. The orphans' court did not abuse its discretion or commit an error of law when it found that appellants failed to prove that Decedent had a weakened intellect at the time of the transfer.[5]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/10/18

---

[5] As appellants failed to prove this prong of undue influence, we need not address appellants' contention that the orphans' court abused its discretion when it determined that appellants' failed to establish that a confidential relationship existed between Decedent and Mrs. Hill.